UNITED STATES of America, Appellee,

v.

James A. KELLY, Jr., Defendant, Appellant.

No. 83–1082.

United States Court of Appeals, First Circuit.

Argued Sept. 7, 1983.

Decided Nov. 30, 1983.

Certiorari Denied Feb. 27, 1984.

See 104 S.Ct. 1425.

John S. Leonard, Boston, Mass., by appointment of the Court, with whom Theodore E. Daiber and The McLaughlin Bros., Boston, Mass., were on brief, for defendant, appellant.

Amos Hugh Scott, Sp. Asst. U.S. Atty., Boston, Mass., with whom William F. Weld, U.S. Atty., and Mark E. Robinson, Asst. U.S. Atty., Boston, Mass., were on brief, for appellee.

Before COFFIN, Circuit Judge, FAIRCHILD,* Senior Circuit Judge, and BOWNES, Circuit Judge.

BOWNES, Circuit Judge.

Defendant-appellant, James A. Kelly, Jr. appeals from a jury conviction on one count of extortion in violation of the Hobbs Act, 18 U.S.C. § 1951. Appellant was charged in a one-count indictment with extortion induced under color of official right. The indictment alleges specific instances in which the appellant knowingly, willfully, and unlawfully affected interstate commerce by extorting money and other items of value from Masiello & Associates Architects, Inc. The indictment goes on to assert that in exchange for monetary enrichment as well as for travel, entertainment, and equipment, Kelly misused his office as Senator, and Chairman of the Massachusetts Senate Ways and Means Committee to influence "the award, supervision and continuation of contracts sought or held by Masiello & Associates Architects, Inc."

Kelly raises the following issues: (1) that there was a constructive amendment to the indictment; (2) that the district court erred in denying appellant's various motions to assuage alleged prejudicial publicity by a change of venue, a continuance, jury sequestration during trial, and jury sequestration during deliberations; (3) that the district court wrongly denied a motion for investigation and inquiry of jury bias and jury misconduct; and (4) that the court erred in denying appellant's motion for a new trial. Finding no error, we affirm.

*Constructive Amendment of the Indictment*

Turning to the issue of the constructive amendment to the indictment, we first look at the actual grand jury indictment of September 30, 1980. The one-count indictment charged Kelly under 18 U.S.C. § 1951 (Hobbs Act)[1] and identified him as a Sena-

---

* Of the Seventh Circuit, sitting by designation.

1. 18 U.S.C. § 1951 reads in pertinent part:

> (a) Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or at-

tor of the Commonwealth of Massachusetts and Chairman of the Ways and Means Committee of the Massachusetts Senate at all times during the 1970–1976 period covered in the indictment. Specifically, the indictment charged that Kelly committed extortion affecting interstate commerce by accepting money, travel, and equipment from Masiello & Associates in exchange for Kelly's favorably influencing Masiello & Associates contracts with the Commonwealth. The indictment charged that Kelly's actions were all done "under color of official right."

Appellant contends that the admission of testimony that he used actual threats against members of Masiello & Associates or caused them to fear retaliatory action is not proof of extortion "under color of official right," but rather, an element of extortion by "wrongful use of actual or threatened force, violence, or fear," a separate offense. Therefore, reasons the appellant, such evidence constructively amended the indictment, and furthermore, was more prejudicial than probative.

■■■ Appellant's brief is seductively persuasive on the constructive amendment theory. However, after careful analysis of the relevant case law, legislative history, and the record, we must reject his contention. The appellant's argument that the language of 18 U.S.C. § 1951(b)(2) is disjunctive is correct: "The term 'extortion' means the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, *or* under color of official right." (Emphasis added.) We agree that Hobbs Act extortion indictments and prosecutions based on the "under the color of official right" prong

need not include proof of "actual or threatened force, violence, or fear." *See United States v. Williams,* 621 F.2d 123, 124 (5th Cir.1980), *cert. denied,* 450 U.S. 919, 101 S.Ct. 1366, 67 L.Ed.2d 346 (1981) (eight circuits agree that "under color of official right" charge does not require proof of threats); *United States v. Harding,* 563 F.2d 299, 305 (6th Cir.1977), *cert. denied,* 434 U.S. 1062, 98 S.Ct. 1235, 55 L.Ed.2d 762 (1968) (Hobbs Act language is disjunctive); *United States v. Hathaway,* 534 F.2d 386, 393 (1st Cir.1976), *cert. denied,* 429 U.S. 819, 97 S.Ct. 64, 50 L.Ed.2d 79 (1976) (statute is phrased in the disjunctive); *United States v. Kenny,* 462 F.2d 1205 (3d Cir.1972), *cert. denied,* 409 U.S. 914, 93 S.Ct. 233, 34 L.Ed.2d 176 (1972) (seminal case, setting forth the proposition that "under color of official right" language is disjunctive).

To comprehend this disjunctive interpretation it is imperative to view in historical perspective the origin of the bifurcated nature of the statute's language. Because the legislative history is silent on the congressional intent in promulgating the disjunctive language,[2] the meaning of the language is therefore interpreted through the development of case law. The Hobbs Act's two branches represent, on one hand, the early common law definition of extortion, and, on the other hand, the present day extension of the statute to individuals who are not public officials. Blackstone described the crime of extortion as "an abuse of public justice, which consists in any officer's unlawfully taking, by colour of his office, from any man, any money or thing of value that is not due him, or more than is due, or

tempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined not more than $10,000 or imprisoned not more than twenty years, or both.
. . . .
(2) The term "extortion" means the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right.
(3) The term "commerce" means commerce within the District of Columbia, or any

Territory or Possession of the United States; all commerce between any point in a State, Territory, Possession, or the District of Columbia and any point outside thereof; all commerce between points within the same State through any place outside such State; and all other commerce over which the United States has jurisdiction.

2. 92 Cong.Rec. 11,899–11,922 (1945) (*see especially,* page 11,901 where Mr. Celler reiterates without further amplification the statute's definition of extortion).

before it is due." 4 W. Blackstone, *Commentaries* 140–41. *See United States v. Harding,* 563 F.2d 299, 306 (6th Cir.1977), *cert. denied,* 434 U.S. 1062, 98 S.Ct. 1235, 55 L.Ed.2d 762 (1978); *United States v. Butler,* 618 F.2d 411, 418 (6th Cir.1980), *cert. denied,* 447 U.S. 927, 100 S.Ct. 3024, 65 L.Ed.2d 1121 (1980). *United States v. Kenny,* 462 F.2d 1205 (3d Cir.1972), *cert. denied,* 409 U.S. 914, 93 S.Ct. 233, 34 L.Ed.2d 176 (1972), often regarded as the case that placed the official imprimatur on the disjunctive reading of the statute states:[3]

> [P]rivate persons may violate the statute by use of fear and public officials may violate the act by use of fear, persons holding public office may also violate the statute by a wrongful taking under color of official right.

*Id.* at 1229.

■■■ To prevail on the theory that there has been a constructive amendment to the indictment, appellant must show that his fifth and sixth amendment rights have been infringed. The fifth amendment requires that a defendant be tried only on a charge made by the grand jury.[4] *Stirone v. United States,* 361 U.S. 212, 216–17, 219, 80 S.Ct. 270, 272–73, 274, 4 L.Ed.2d 252 (relying heavily on *Ex parte Bain,* 121 U.S. 1, 7 S.Ct. 781, 30 L.Ed. 849 (1887), defendant may not be convicted on a charge not made by the grand jury); *Ex parte Bain,* 121 U.S. 1, 5–6, 7 S.Ct. 781, 783–84, 30 L.Ed. 849 (1887) (fifth amendment mandates that indictment may not be amended without resubmission to grand jury); *United States v. Ylda,* 653 F.2d 912, 914 (5th Cir.1981) ("The misconstruction of an indictment is reversible error if it is possible that the defendant was tried and convicted for a crime other than that alleged in the indictment."); *United States v. Trotta,* 525 F.2d 1096, 1099 (2d Cir.1975), *cert. denied,* 425 U.S. 971, 96 S.Ct. 2167, 48 L.Ed.2d 794 (1976) (defendant may be tried only on grand jury's indictment and no other). The sixth amendment, working in tandem with the fifth amend-

ment, requires that the defendant "be informed of the nature and cause of the accusation." U.S. Const. amend. VI.

■■ These two constitutional provisions require that allegations and proof mirror each other. The rationale is clear: no person should be denied the right to thoroughly prepare his or her defense, and should not be subject to "another prosecution for the same offense." *Berger v. United States,* 295 U.S. 78, 82, 55 S.Ct. 629, 630, 79 L.Ed. 1314 (1934). *See United States v. Gonzalez,* 661 F.2d 488, 492 (5th Cir.1981); *United States v. Beeler,* 587 F.2d 340 (6th Cir.1978), *cert. denied,* 450 U.S. 860, 102 S.Ct. 315, 70 L.Ed.2d 158 (1981).

> The purposes underlying the rule against amendments and constructive amendments include notice to the defendant of the charges he will face at trial, notice to the court so that it may determine if the alleged facts are sufficient in law to support a conviction, prevention of further prosecution for the same offense, and finally, of "paramount importance," the assurance that a group of citizens independent of prosecutors or law enforcement officials have reviewed the allegations and determined that the case is worthy of being presented to a jury for a determination of the defendant's guilt or innocence.

*Id.* at 342.

Logically, then, the standard of review that we must employ in determining the validity of appellant's argument is whether he has made a *convincing* showing that the alleged alteration in the indictment did in fact change the elements of the offense charged, and whether he was convicted of a crime not charged in the grand jury indictment.

At the twenty-five day trial, numerous witnesses testified, including William V. Masiello, former Treasurer and President of Masiello & Associates; Walter Judd Kassu-

---

3. Ruff, *Federal Prosecution of Local Corruption: A Case Study in the Making of Law Enforcement Policy,* 65 Geo.L.J. 1171, 1184 (1977).

4. The fifth amendment provides in relevant part: "No person shall be held to answer for a capital, or otherwise infamous crime, unless on presentment or indictment of a Grand Jury . . . ."

ba, President of Kassuba Realty Corporation; and James L. Bauchat, Executive Vice-President of Kassuba Corporation. Appellant points to nine instances of admission of testimony of threats as constituting a constructive amendment of the indictment. The pertinent parts of the testimony in question are reproduced below:

1. Masiello: ... but I was afraid of Senator Kelly. I have said that before and I have just about—I have just about told everybody. I hope that I don't offend Mr. MacDonald, but Jimmy and the Irish people say that they don't get mad, they just get even. It was a pet Irish expression of Senator Kelly, and he lived with that, you know. He never got mad. He just got even with people. I feared him for that one reason. He would be vindictive. If you hurt him in some way, he would get back at you ....

2. Kassuba: My state of mind was, that based on the strong recommendations and concern of Jim Bauchat and the recommendation of Frank Masiello, that we would lose substantial business up here if we didn't do it. I thought it was the prudent thing to do.

3. Bauchat: Oh, Senator Kelly said, in a rough voice, "Damn it to hell, who does Kassuba think he is putting me off like this?"

4. Bauchat: I told Frank that I'd never had such a brazen approach in my life.

5. Masiello: Some times [sic] during that same con—same meeting, he stated that in his capacity of—as Chairman of the Senate Ways and Means Committee he could be very helpful and he could also be very disruptive.

6. Masiello: And I told Mr. Kassuba that Mr. Kelly had come in and had posed a veiled threat that if we didn't retain Billy as a member of Masiello & Associates and didn't—and didn't continue to employ him, that there could be some problem—trouble with our contracts being canceled in the State of Massachusetts or in the Commonwealth of Massachusetts.

7. Masiello: ... Judd Kassuba asked me if I thought that Senator—if—if

Senator Kelly could, in fact, do the type of things that he alluded to, such as having our contracts canceled in Massachusetts or if he could help us? And I said: There wasn't any question about it. I didn't feel—think that we ought to put him to—put it to the test.

8. Masiello: Well, he just said that he felt that if—if we didn't get these checks to him that he was going to start raising all kinds of heck.

9. Masiello: I told Mr. Kassuba essentially the same thing; that we better not put Senator Kelly to the test; that I thought he could carry out all the threats that he made about canceling contracts or rescinding them or delaying the—the progress of the contracts.

Turning to the two-step analysis set forth above, we first find that the appellant has not shown that that testimony did in fact change the elements of the offense charged. We discount that argument on two points. First, the accepted interpretation of the "under color of official right" language has evolved in such a manner that it does not exclude the introduction of proof of threats inherent in the public office. The rationale is, that subsumed in the official title lies a dormant power, the office itself becomes the threat, the ominous spectre capable of retaliating when provoked. See United States v. Margiotta, 688 F.2d 108, 132 (2d Cir.1982), U.S.App. pnd'g, ("The use of public office, with the authority to grant or withhold benefits, takes the place of pressure or threats."); United States v. Butler, 618 F.2d 411, 418 (6th Cir.1980), cert. denied, 447 U.S. 927, 100 S.Ct. 3024, 65 L.Ed.2d 1121 (1980) ("The coercive element on the part of the official, and the 'duress' or 'fear' element on the part of the 'victim' are implied from the public official's position of authority over the victim."); United States v. Hathaway, 534 F.2d 386, 394 (1st Cir.1976), cert. denied, 429 U.S. 819, 97 S.Ct. 64, 50 L.Ed.2d 79 (1976) ("The misuse of public office is said to supply the element of coercion."); United States v. Mazzei, 521 F.2d 639, 645 (3d Cir.1975), cert. denied, 423 U.S. 1014, 96

S.Ct. 446, 46 L.Ed.2d 385 (1975) ("Under the common law definition, color of public office took the place of the coercion implied in the ordinary meaning of the word 'extortion.' ").

The testimony that described the witnesses' perceived fear of possible retribution through official fiat does not amount to a new charge, that of "obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear." 18 U.S.C. § 1951(b)(2). It bore directly on what "under color of official right" encompasses: the ever-present opportunity of a public official to misuse his power under the guise of official duty.

■ The district court did not err in admitting the testimony under the state of mind exception to the hearsay rule. Fed.R. Evid. 803(3).[5] 18 U.S.C. § 1951 requires as an essential element of proof the state of mind of the victim. *United States v. Price,* 617 F.2d 455, 459 (7th Cir.1979); *United States v. Adcock,* 558 F.2d 397, 403 (8th Cir.1977), *cert. denied,* 434 U.S. 921, 98 S.Ct. 395, 54 L.Ed.2d 277 (1977). The reason for admitting the testimony and the limitation on its use were carefully explained to the jury:

> THE COURT: Members of the jury, as I explained to you yesterday, these conversations that Mr. Kassuba had with Mr. Bauchat and Mr. Frank Masiello are admissible not to—to prove the truth of any of the statements that were made. They are simply admissible to show what these people thought about why they were doing things or why they were going to do things. It's simply their state of mind that is being proved by this, not anything that Mr.—Mr. Kelly did or did not do: that Mr. Masiello did or did not do. It is simply—that is, Mr. William Masiello. It is simply to prove what Mr. Kassuba was thinking at the time that he had these conversations. And that's all.

This instruction was repeated in substance in the final charge.

■ Appellant also argues that admission of this testimony was more prejudicial than probative. We disagree. The testimony was relevant and admissible. Any damning evidence is prejudicial in the sense that it hurts the party against whom it is admitted. But that does not make it inadmissible. The question is whether "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Fed.R. Evid. 403. We find that it was not.

Appellant's reliance on *Stirone v. United States,* 361 U.S. 212, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960), and *United States v. Cusmano,* 659 F.2d 714 (6th Cir.1981), is misplaced. *Stirone* posed the basic question of whether the defendant "was convicted of an offense not charged in the indictment." *Id.* 361 U.S. at 213, 80 S.Ct. at 271. The Supreme Court found that he had been and reversed. The case can be distinguished on its facts. The indictment charged Stirone with obstructing interstate commerce shipment of sand from outside Pennsylvania by way of extortive threats. The district court, over Stirone's objection, admitted evidence of his interference with steel shipments. *Id.* at 213–14, 80 S.Ct. at 271–72. Moreover, the district court's charge to the jury stated that guilt might rest on either the interference with sand shipments, or the interference with steel shipments. *Id.* at 214, 80 S.Ct. at 271–72. These were two separate wrongful acts, one of which was not in the original indictment. Allowing the evidence of interference with steel shipments clearly operated as an amendment to the indictment.

In *Cusmano,* 659 F.2d 714, the indictment charged interference with steel production by threats of economic loss; truck drivers were threatened with unprofitable loads, loss of their jobs and loss of equity in their

---

5. Fed.R.Evid. 803(3) provides:

**(3) Then existing mental, emotional, or physical condition.** A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant's will.

equipment. *Id.* at 715. At the trial, witnesses were permitted to testify as to fear of physical violence as well as threats of economic loss. The jury was instructed that if "defendant deliberately and intentionally utilized another person's reasonable fear of actual or threatened force or violence, or of economic loss, to obtain property from that person, extortion has been committed." *Id.* at 717. The Sixth Circuit reversed, finding that "[t]he events at Cusmano's trial effectively altered the changing terms of the indictment, thus destroying his right to be tried only on the charges set forth in the indictment." *Id.* at 719. Here, however, the threats were not of physical violence. They were economic threats; the Masiello firm feared what Senator Kelly could do by virtue of the powerful public office he held. Moreover, the district court's instructions on this were clear and correct.

Part 2; that is that the—Senator Kelly used the power and authority of his office to obtain money not due him or his office. With respect to that, the Government must prove that he obtained money from the Masiello firm and that he did so by the misuse of the real or perceived power of his office. It does not matter whether he induced the payments to perform or not to perform some official function.

It is the obtaining of the—of the payments that—that is the extortion.

The Government need not prove that the Defendant used force or threats or that he in any way imparted fear. If the Government proves that Senator Kelly induced the payments because of his official position, it has shown that he obtained them under color of official right.

*Pretrial Publicity*

Kelly's trial began on November 15, 1982, and ended on December 23, 1982. This was a second trial; the first trial commenced on March 19, 1981, and ended on April 29, 1981, when the jury was unable to reach a verdict.

The record includes an extensive 200-page exhibit of newspaper clippings purporting to show prejudicial press coverage. After thorough examination of the newspaper clippings, we come to the following conclusions. (1) The exhibit at various times includes coverage of the same story by different local newspapers. (2) With few exceptions, the journalistic style of the articles is objective, factual, and professional. (3) Frequently, the articles are no more than verbatim reprints of testimony from the Ward Commission, a Commonwealth committee constituted to investigate corrupt practices in government. (4) The alleged publicity was remote in time from the beginning of Kelly's trial, November 15, 1982. For example, approximately thirty percent of the exhibit consists of articles published in 1980. Much of the 1981 material covers testimony before the Ward Commission as well as a fifty-six-page abstract of the Commission's lengthy report as it appeared in the *Boston Globe* on January 5, 1982. The other 1981 material focuses on issues relative to the earlier mistrial. (5) Kelly is not singled out as the sole allegedly corrupt politician. The names of other individuals frequently accompany Kelly's name in the same article.

Looking to the case law on the question of prejudicial pretrial publicity, we find that in order for there to be an atmosphere requiring one or more of the stringent judicial measures requested by defendant in his motions, the publicity must be proximate in time to the trial, the accused must be the focus of the publicity, and the publicity must be sensational in nature. In *Sheppard v. Maxwell,* 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1965), the media reported a public inquest at a school gym, published Sheppard's letters to his son and other correspondence, printed inflammatory and pejorative headlines, reporters had free reign of the courtroom and surrounding rooms during the trial, and jurors were constantly exposed to and hounded by the media. *Id.* at 338–353, 86 S.Ct. at 1510–1517. The Supreme Court categorized the *Sheppard* publicity as "virulent," and the case as "notorious," engendering a "carnival atmosphere." *Id.* at 354, 358, 86 S.Ct. at 1518, 1519–20. The Court found that the balance between free press and the right to a fair trial should not tip against the defendant.

*Id.* at 362, 86 S.Ct. at 1522. *Sheppard* is easily distinguished from this case; Kelly was not subjected to a trial by the media nor to a circus-like atmosphere before and during the trial.

In *Delaney v. United States,* 199 F.2d 107 (1st Cir.1952), the accused was arraigned on September 17, 1951. On October 1, 1951, he was told that the Subcommittee on Administration of the Internal Revenue Laws (King Committee) would soon commence its investigation of him. Between October 16 and October 22, 1951, the public hearings focused on Delaney. *Id.* at 109. The hearing itself inquired into matters not relevant to the charge. *Id.* at 110. Delaney, unlike Kelly, was the focus of the investigation, and the public hearings preceded closely his scheduled trial. Kelly, unlike Delaney, was only one of many individuals who were being investigated by the Ward Commission.

Certainly, the pretrial publicity was not of the nature that we listed in *Patriarca v. United States,* 402 F.2d 314 (1st Cir.), *cert. denied,* 393 U.S. 1022, 89 S.Ct. 633, 21 L.Ed.2d 567 (1969), as presenting the greatest hazards to a fair trial.

> Nor do we find a suggestion of the kind of prejudicial statements or records of conviction, arrests, or indictments emanating from a public official, zealous attempts by the media to arouse a community on a particular trial, reports of refusal to submit to certain tests, pejorative characterizations of a defendant, description of evidence against the accused or reports of plea negotiation cited as presenting the "greatest hazards" to a fair trial by the ABA, Standards Relating to Fair Trial and Free Press, (Tentative Draft, Dec. 1966), pp. 25–40.

*Id.* at 317 (footnote omitted).

*Voir Dire*

In considering the propriety of the district court's denial of the motions directed to alleged prejudicial publicity, we must consider its voir dire procedure.

The extensive questions posed at the voir dire inquired into the prospective juror's governmental ties, exposure to the media, preconceived prejudices as to guilt, willing-

ness to render a verdict based on the evidence presented, willingness to accept the tenet that no inference of guilt arises from a defendant's failure to testify on his own behalf, and previous juror experience. In a case involving a fact pattern similar to this one, the Seventh Circuit held that after an extensive voir dire, such as the one here, there is nothing to raise a presumption of partiality. It also noted, "a court is powerless to control news coverage before it has jurisdiction or before such coverage can be brought to its attention." *Margoles v. United States,* 407 F.2d 727, 731 (7th Cir. 1969), *cert. denied,* 396 U.S. 833, 90 S.Ct. 89, 24 L.Ed.2d 84 (1969).

Appellant argues that because numerous jurors stated during voir dire that they had heard of Kelly they should have been disqualified. Most, however, only had a vague recollection of him. Those who were well versed in the Kelly saga, or demonstrated some actual or potential bias were either challenged through peremptory challenges or dismissed for cause. To assert that each juror's mind be a *tabula rasa* is an absurdity, and the courts have consistently recognized this:

> It is not required, however, that the jurors be totally ignorant of the facts and issues involved. In these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case. This is particularly true in criminal cases. To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court. *Spies v. Illinois,* 123 U.S. 131 [8 S.Ct. 22, 31 L.Ed. 80]; *Holt v. United States,* 218 U.S. 245 [31 S.Ct. 2, 54 L.Ed. 1021]; *Reynolds v. United States, supra.*

*Irvin v. Dowd,* 366 U.S. 717, 722–23, 81 S.Ct. 1639, 1642–43, 6 L.Ed.2d 751 (1961).

The trial judge has "wide latitude of discretion ... in supervising the conduct of the trial." *Walsh v. United States,* 371 F.2d 436, 438 (1st Cir.1967), *cert. denied,* 387 U.S. 947, 87 S.Ct. 2083, 18 L.Ed.2d 1335 (1967). We find that the district court did not abuse its discretion in denying defendant's motions for change of venue or a continuance.

We also think the district court acted well within its discretion in denying the motions to sequester the jury during trial and deliberations. *See United States v. Porcaro,* 648 F.2d 753, 755 (1st Cir.1981) ("The decision whether to sequester the jury lies within the sound discretion of the district court."); *United States v. Almonte,* 594 F.2d 261, 267 (1st Cir.1979) ("... it lies within the trial judge's discretion to decide whether or not to allow the jury members to disburse before they have completed their deliberations and reached a verdict."); *United States v. Curtis,* 520 F.2d 1300, 1304 (1st Cir.1975) (matter of jury sequestration is a matter of district court discretion). The district court was careful to repeatedly tell the jurors not to read, listen, or watch on television any matter that dealt with the case they were hearing, and not to discuss the case with anyone.

*Motion for Investigation and Inquiry as to Jury Bias and Jury Misconduct*

The factual background that gave rise to appellant's motion is as follows. Late in the trial on December 17, 1982, Juror No. 1 came forward to the court and stated that one of the other jurors, Mr. McCormick, had "been making statements, kind of forming opinions, way before he should be. He's been closed minded...." Based upon that revelation, it was determined that an *in camera* individual voir dire of each juror should be held to determine if any partiality among the jurors existed. Subsequently, each juror was asked whether or not he or she maintained an open mind and was willing to deliberate on the guilt or innocence of the defendant. The court determined from Mr. McCormick's responses and demeanor that he should be dismissed and that an alternate should take his place.

Several jurors at the individual voir dire procedure intimated that there were other jurors who had already formed an opinion. No surnames were mentioned, although the first name "Ann" was mentioned. Juror No. 8, Ann Ronukeitus, gave an ambiguous response to the court's questions, "I'm like this: I feel like I want someone else's opinion: Maybe I haven't thought their way and so. I really haven't." There was a later stated apprehension by another juror that Ronukeitus had formed an opinion as to the outcome of the case. The government stated that it would have no objection if Ronukeitus were dismissed. Defendant asked for further inquiry of this juror. The court denied that request. Defendant did not ask that Ronukeitus be dismissed. We can only assume that, considering the experience of defense counsel, the failure to do so was deliberate. We think defendant's failure to ask that the juror be dismissed amounted to a waiver of his right to now ask for a new trial based on the juror's continued service on the panel.

Even if there were not a waiver, the district judge followed the approved procedure when faced with the claim of juror misconduct. It conducted "a full investigation to ascertain whether the alleged jury misconduct actually occurred." *United States v. Doe,* 513 F.2d 709, 711–12 (1st Cir.1975) (quoting *United States v. McKinney,* 429 F.2d 1019, 1026 (5th Cir.1970). The district court found in the case of juror McCormick that the misconduct had occurred and dismissed him from the panel. It found that juror Ronukeitus retained an open mind and should remain on the panel. We are not in a position to second-guess the district court. The trial judge had face-to-face contact with the jurors and was able to observe their demeanor as they answered the voir dire questions. "A district court has broad, though not unlimited, discretion to determine the extent and routine of its inquiry into allegations of juror bias." *United States v. Mirkin,* 649 F.2d 78, 82 (1st

Cir.1981) (quoting *United States v. Corbin,* 590 F.2d 398, 400 (1st Cir.1979).

Finding no irregularity in procedure or abuse of discretion, we uphold the district court's denial of a motion for investigation and inquiry of jury bias and jury misconduct.

*Motion for a New Trial*

The grounds for this motion were mainly the same contentions already discussed. The district court did not abuse its discretion in denying defendant's motion for a new trial.

*Affirmed.*