UNITED STATES of America, Appellee,

v.

**Miguel A. RIVERA–MEDINA, Defendant, Appellant.**

No. 87–1517.

United States Court of Appeals, First Circuit.

Heard Feb. 1, 1988.

Decided April 22, 1988.

Francisco M. Dolz–Sánchez, San Juan, P.R., for defendant, appellant.

H. Manuel Hernández, Asst. U.S. Atty., with whom Daniel F. López Romo, U.S. Atty., Hato Rey, P.R., was on brief for appellee.

Before CAMPBELL, Chief Judge, TORRUELLA and SELYA, Circuit Judges.

TORRUELLA, Circuit Judge.

Appellant Miguel Rivera–Medina was convicted of aiding and abetting, and conspiring with, Alejo Maldonado–Medina in obstructing commerce by extortion, in violation of the Hobbs Act, 18 U.S.C. § 1951, and 18 U.S.C. § 2. He claims on appeal that there was insufficient evidence to convict him of Hobbs Act violations, and that the court erred in admitting certain evidence of other crimes committed both by Rivera and by the witnesses against him. We find no reason to disturb the district court's disposition of this case.

Appellant Miguel Rivera was a police officer in Puerto Rico. His co-conspirator, Alejo Maldonado, was also a member of the police force, and was Rivera's subordinate for sixteen years. Maldonado pleaded guilty to an identical charge of conspiring to violate the Hobbs Act, and agreed to cooperate with the government and to testify against Rivera at trial. The government's case relied heavily on Maldonado's testimony.

The case revealed a sorry tale of corruption in the police force. Julio Cortés–Parés was a well known numbers racketeer. In 1977 he was being extensively investigated by Rafael Mojica, a member of the Caguas Vice Squad. Maldonado orchestrated the transfer of the entire Caguas Vice Squad, through allegations of corruption, in order to stop that investigation. There was evidence from which the jury could conclude that Rivera then caused Mojica to be transferred back to Caguas in order to put pressure on Cortés–Parés, who had earlier expressed an interest in making protection payments to alleviate the pressure of the previous investigation.

As a result of the resumption of Mojica's investigation, Cortés–Parés met with Maldonado. He told Maldonado that he wanted Mojica out of Caguas. After Cortés began making protection payments Rivera once again transferred Mojica elsewhere. The evidence is clearly sufficient to support the inference that Rivera did this because of the payments Cortés had made.

Cortés continued making payments of about $600 a month, and was reportedly satisfied with the arrangement. He testified that he felt he was being protected and kept abreast of important developments as a result of the payments. These payments were initially split between three people, but later were divided only between Maldonado and Rivera.

After some time, however, as tends to happen in these cases, Maldonado began to complain to Cortés that he was not being paid enough. In consequence, Cortés increased the payments to $800 per month. Maldonado then advised Cortés that he (Cortés) was in imminent danger of being robbed by a fellow police officer. Cortés asked Maldonado to prevent this, which Maldonado did, and as a result the racketeer began paying Maldonado $1,000 every month. The payments stopped, however, after Cortés was the victim of several robberies. He felt, apparently, that the payments had lost their efficacy.

The first of two challenges to the sufficiency of the evidence alleges that the government failed to prove that either Maldonado or Rivera made any demand on Cortés for the money.

Appellant points out that it was Cortés who initially made known to Maldonado that he was willing to pay to relieve the investigative pressure he felt at the time. The government responds that proof of a demand was presented at trial and, even if it was not, that a demand is not necessary to the offense of extortion under color of official right.

■ The definition of extortion under 18 U.S.C. § 1951 is as follows:

The term "extortion" means the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right.

18 U.S.C. § 1951(b)(2).

The so-called "disjunctive" reading of this definition is now unquestionably the law in this and most other circuits: extortion can occur *either* as a result of the wrongful use of actual or threatened force, violence or fear; *or* under color of official right. *See, e.g., United States v. Bucci*, 839 F.2d 825, 827–28 (1st Cir.1988); *United States v. Kelly*, 722 F.2d 873, 875 (1st Cir.1983), and authorities cited therein. It is clear under this reading that extortion under color of official right need not be the product of "actual or threatened force, violence, or fear." *Kelly*, 722 F.2d at 875. In the case of a public official, rather, the threat is implicit in the power he wields by virtue of his office:

"The rationale is, that subsumed in the official title lies a dormant power, the office itself becomes the threat, the ominous spectre capable of retaliating when provoked."

*Id.* at 877.

Thus, the courts have found extortion when an individual pays because he reasonably believes that if he did not an official might use his power to that individual's detriment. *See, e.g., United States v. Hathaway*, 534 F.2d 386, 395 (1st Cir.1976).

■ In this case we find both that implicit threat, and overt demands for money. The fact that Cortés approached Maldonado first does not mean that extortion did not occur. In *Hathaway*, 534 F.2d 386, for example, we faced a similar situation. There, a contractor named Graham was allegedly extorted by Baptista, a public official who made himself out to have authority over the granting of government contracts. We said:

To be sure, on both occasions, Graham himself may have first brought up the subject of payments. But the jury could find that the impetus came from a reasonable apprehension that, without paying, [the contractor] would not be considered by the Authority. Baptista's exploitation of such a fear amounted to extortion notwithstanding Graham's readiness and even eagerness to play the game.

*Id.* at 395 (citation omitted).

Here Cortés reasonably believed that if he did not pay, the investigation against him would lead to his ultimate apprehension, and the dismantling of his operation. That fear led him to approach Maldonado, and resulted in substantial monthly payments. The same fear led him to acquiesce in the demands that, according to Cortés' own testimony, Maldonado made, regarding an increase in the monthly payments, from $600 or $700, to $800 per month.

While this one incident is probably enough, the jury could also find an implicit threat and demand in Cortés' recital of the facts that led to an increase to $1,000 in the payments:

Well, during sometime I was paying $800 to Alejo until sometime later he visited me here in Santurce on Stop 18 and informed me that El Flaco from Caguas was going to rob me. I asked him who El Flaco was and he told me his name was César Caballero. I asked him if he knew him and he told me, yes, that they were friends and then I told him then can you avoid this, stop this? If you are able to stop this well, I will increase the amount that I am giving to you and then he immediately called César Caballero on the phone and told him, "I am here with Julito. I am speaking with him so forget about it. I will fix everything up with you" and from that moment on I began paying him $1,000 monthly.

There was additional evidence, although the record is less clear, that Miguel Rivera arranged to put pressure on Cortés to induce him to pay. Specifically, it appears that Mojica, the investigator Cortés was most afraid of, was transferred out of Caguas, before Maldonado and Rivera began receiving money from Cortés. Rivera transferred him back to Caguas to resume investigating Cortés, and only transferred him out again after the payments began. The jury could easily infer that Rivera and Maldonado, unbeknownst to Mojica, used Mojica to lean on Cortés, in order to force him to pay protection money.

In view of all this evidence, it is nothing short of specious to argue that the government failed to prove that the co-conspirators used their power as police officers to induce Cortés to part with his money.

■ The second challenge presented by the appellant concerns the effect of this scheme on interstate commerce. Rivera argues that there is insufficient evidence of Cortés' involvement in interstate commerce, because his numbers racket was a very local operation. The Supreme Court has recognized that Congress intended the Hobbs Act to reach as far as the Constitution would permit. *United States v. Culbert,* 435 U.S. 371, 373, 98 S.Ct. 1112, 1113, 55 L.Ed.2d 349 (1978); *Stirone v. United States,* 361 U.S. 212, 215, 80 S.Ct. 270, 272, 4 L.Ed.2d 252 (1960). We have held, therefore, that the government need only show a realistic probability of a de minimis effect on interstate commerce, in order to bring extortion within the reach of the Hobbs Act. *United States v. Jarabek,* 726 F.2d 889, 900–901 (1st Cir.1984).

■ The government here proved that Cortés was purchasing articles necessary to his operation that were brought into Puerto Rico from the United States mainland. These articles included business machines purchased at Sears, as well as stationery and office supplies. Given the leniency of the standard, the jury could reasonably believe that paying up to $1,000 per month depleted Cortés' assets so that his ability to purchase these articles was significantly impaired. *See United States*

*v. DiGregorio,* 605 F.2d 1184, 1190–91 (1st Cir.1979) (minimal depletion of resources will suffice); *Hathaway,* 534 F.2d 386, 397; *United States v. Mazzei,* 521 F.2d 639, 642 (3d Cir.1975).

Appellant argues that the payments cannot be said to have depleted Cortés' assets because they permitted him to act with impunity, and because otherwise all of his assets were subject to forfeiture and sale. However, in *United States v. Jarabek,* 726 F.2d 889, 901 (1st Cir.1984), we found the requisite effect based on a showing that *non-compliance* with the officer's demands would have impaired the victim's participation in interstate commerce (citing *Stirone v. United States,* 361 U.S. 212, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960)). Under *Jarabek,* therefore, the threat to reduce his income to zero, and consequently his participation in legitimate interstate commerce, is sufficient to meet the test. We will not venture to answer the question whether paying up to $1,000 per month to a police officer is calculated to increase or deplete an illegal numbers operator's income. We find instead that, in either event, the jury here could find a potential effect on interstate commerce.

■ The next claim of error questions the admission, under Fed.R.Evid. 404(b), of evidence of other crimes in which Miguel Rivera–Medina was involved, but for which he was neither indicted nor convicted. The evidence detailed Rivera's involvement in two other similar conspiracies to extort, also with Maldonado as a co-conspirator. Appellant argues that the evidence was introduced solely to prove the defendant's propensity to commit crimes. The government responds that, on the contrary, the evidence was relevant to prove knowledge, intent and absence of mistake.

Evidence admitted under 404(b) must pass a two part test. First it must be admissible to show something other than that the defendant acted in conformity with his bad character. Intent, knowledge, and absence of mistake are among the listed permissible inferences from evidence of other crimes. *See* Fed.R.Evid. 404(b). In addition, on balance, the probative value of

the evidence must outweigh its likely prejudicial effect. *See* Fed.R.Evid. 403. *See generally, United States v. Scelzo,* 810 F.2d 2, 3–4 (1st Cir.1987); *United States v. Kadouh,* 768 F.2d 20, 21 (1st Cir.1985).

The result of the district court's balancing will be reviewed only for abuse of discretion. *Scelzo,* at 4; *Kadouh,* at 21. Only if "the district court's ruling did not fall within the ambit of reasonable debate," *United States v. Currier,* 821 F.2d 52, 55 (1st Cir.1987), will we intervene. This was clearly not the case here.

Rivera's knowledge of this scheme, his intent and absence of mistake were clearly in issue below. There was little evidence of his personal participation in the scheme other than the testimony of Maldonado, an eminently impeachable witness. The defense could easily have argued that Rivera was simply used by Maldonado as an innocent pawn, to coerce money from Cortés who mistakenly believed that Maldonado could actually influence Rivera's actions. In fact, appellant's attorney implied as much in this appeal. To rebut this argument, the prosecution put forth evidence that Rivera knew of identical schemes that had taken place within the same time frame as the charged offense.

The striking similarity of the uncharged offenses to the one recited in the indictment, the identity of co-conspirators, and the temporal proximity of all three schemes, all make this an easy case for admission of this evidence. *Compare, United States v. Henderson Simon,* 842 F.2d 552, 555–56 (1st Cir.1988) (Torruella, J., concurring). Its tendency to prove absence of mistake, knowledge and intent clearly exceeds its admittedly prejudicial impact. In addition, the district court cushioned that impact with one carefully worded limiting instruction at the time of admission of the evidence, and another at the end of trial. We find no abuse of discretion in the judge's decision to admit the evidence of other uncharged crimes.

■ The last argument put forth by Rivera concerns the prosecution's decision, on direct examination, to elicit from witnesses for the prosecution a litany of over 100 crimes they had committed. He argues that by presenting these witnesses in such a bad light, and subsequently demonstrating the close association between them and Rivera, the prosecution was attempting to convict Rivera of guilt by association. The prejudicial impact of this evidence, appellant claims, deprived him of a fair trial.

The government responds that it was simply trying to defuse the prejudicial impact of this evidence by preempting the defense's attempts to impeach. It argues that the defense could have substantially discredited all of these witnesses if the government had attempted to present them as upright members of society, and the defense had then on cross-examination brought out their sordid histories. This is by no means a novel tactic, and the courts have heretofore recognized its legitimacy. *See, e.g., United States v. Countryman,* 758 F.2d 574, 577 (11th Cir.1985); *United States v. Cortez,* 757 F.2d 1204, 1207 (11th Cir.), *cert. denied,* 474 U.S. 945, 106 S.Ct. 310, 88 L.Ed.2d 287 (1985). The Eighth Circuit, in its evaluation of the competency of a lawyer who himself had brought out his client's prior convictions, addressed the problem:

> The introduction by a witness himself, on his direct, of a prior conviction is a common trial tactic, recommended by textwriters on trial practice. There is a paucity of authority justifying in theory this well accepted practice, but it has been justified on the ground that it serves a twofold purpose: (a) to bring out the witness' "real character," the whole person, particularly his credibility, and (b) to draw the teeth out of the adversary's probable use of the same evidence on cross-examination.

*United States v. Bad Cob,* 560 F.2d 877, 883 (8th Cir.1977) (footnotes omitted).

We are troubled, however, by the prosecutor's thoroughness and attention to detail, by his repeated insistence that the witnesses remember just one more crime. He dredged up, on direct examination, evidence that would have been inadmissible, had the defense attempted to bring it out. This seems somewhat inconsistent with the

prosecution's avowed task of minimizing the damage. Indeed, had the defense objected, we would feel compelled to closely analyze the propriety of such extensive questioning of witnesses with close links to the defendant.

In the case before us, however, defendant's counsel made a tactical choice. He was apparently satisfied that the damage done to the credibility of the witnesses for the prosecution outweighed the prejudicial impact of his client's association with such unsavory characters. He therefore did not object to the evidence elicited by the government. In cases such as this, where the appellant claims an error to which he did not object at trial, we apply the plain error standard. *See* Fed.R.Crim.P. 52(b).

The plain-error doctrine of Federal Rule of Criminal Procedure 52(b) tempers the blow of a rigid application of the contemporaneous-objection requirement. The Rule authorizes the Courts of Appeals to correct only "particularly egregious errors," *United States v. Frady,* 456 U.S. 152, 163 [102 S.Ct. 1584, 1592, 71 L.Ed.2d 816] (1982), those errors that "seriously affect the fairness, integrity or public reputation of judicial proceedings," *United States v. Atkinson,* 297 U.S. [157], at 160 [56 S.Ct. 391, 392, 80 L.Ed. 555 (1936)]. In other words, the plain-error exception to the contemporaneous-objection rule is to be "used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result." *United States v. Frady,* 456 U.S. [152], at 163, n. 14 [102 S.Ct. 1584, 1592 n. 14, 71 L.Ed.2d 816 (1982)]. *United States v. Young,* 470 U.S. 1, 15, 105 S.Ct. 1038, 1046, 84 L.Ed.2d 1 (1985). We cannot agree, in view of the record as a whole, that the defense's tactical choice so seriously infected Rivera's trial with prejudice as to constitute a miscarriage of justice. Defense counsel balanced competing interests and opted to allow the impeachment of the witnesses for the prosecution. While perhaps not a wise decision, and while defendant's appellate counsel assures us he would have done it differently, we do not find that decision so shocking as to warrant reversal under the plain error

standard. *Cf., Marshall v. United States,* 409 F.2d 925, 927 (9th Cir.1969).

In conclusion, we reject appellant's challenges to the sufficiency of the evidence and to the court's evidentiary rulings. Miguel Rivera–Medina's conviction is therefore *affirmed.*