# United States Court of Appeals
## For the First Circuit

---

Nos. 03-2544
     04-1791

UNITED STATES,

Appellant,

v.

MARIA DE LOS ANGELES RIVERA RANGEL, A/K/A ANGIE,

Defendant, Appellee.

---

APPEALS FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PUERTO RICO

[Hon. Juan M. Pérez-Giménez, U.S. District Judge]

---

Before

Lynch, Circuit Judge,
Stahl, Senior Circuit Judge,
and Howard, Circuit Judge.

---

Kathleen A. Felton, Attorney, with whom H.S. Garcia, United States Attorney, Guillermo Gil, Assistant United States Attorney, and Maritza Gonzalez de Miranda, Assistant United States Attorney, U.S. Department of Justice, were on brief, for appellant.
Ignacio Fernández de Lahongrais, with whom Edgar Vega Pabon was on brief, for appellee.

---

February 8, 2005

---

**STAHL**, <u>**Senior Circuit Judge**</u>.    Appellee Maria de los Angeles Rivera Rangel ("Rivera") used her position as an executive assistant to the Governor of Puerto Rico to help four contractors-- Jose Ventura Asilis ("Ventura"), Angel Ocasio Ramos ("Ocasio"), Joaquin Arbona ("Arbona"), and Edwin Loubriel ("Loubriel")--gain access to government officials and obtain expedited treatment of their government business.    The contractors paid Rivera for her assistance.

As a result of these arrangements, Rivera was charged with one count of conspiracy to interfere with commerce by extortion induced by fear of economic harm and under color of official right, in violation of 18 U.S.C. § 1951 ("the Hobbs Act"), and one count of aiding and abetting the underlying offense, in violation of the Hobbs Act and 18 U.S.C. § 2.[1]  Rivera was tried before a jury and convicted on both counts.  She then moved for a judgment of acquittal or a new trial.  The district court granted Rivera a judgment of acquittal and, if that judgment were reversed on appeal, a new trial.  The government now appeals those rulings. We reverse and remand with the instruction that the jury verdict be reinstated and for proceedings consistent with this opinion.

---

[1]According to 18 U.S.C. § 2(a), "Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal."

## I.  Background

We present the relevant facts in the light most favorable to the verdict.  See United States v. Llinas, 373 F.3d 26, 28 (1st Cir. 2004).  The facts are derived from testimony given during Rivera's trial.

In 1992, Ventura, a contractor who provided services to the government of Puerto Rico,[2] met Ocasio, who at that time was the Deputy Chief of Staff to the Governor of Puerto Rico.  Ocasio told Ventura that if he needed any help with his business dealings with the government, Ocasio would be "at [his] service." Thereafter, Ventura would call Ocasio whenever he had difficulty obtaining government permits and Ocasio would arrange meetings between Ventura and those government officials who had authority to issue the permits Ventura desired.  In return, Ventura paid Ocasio $30,000 to $35,000 per year.  This arrangement continued until Ocasio left his government post in 1995 and set up a private consulting business that provided services to the government of Puerto Rico. At that point, Ventura concluded that, to further his business interests, he would need the assistance of another government insider.

Thus, in 1996, acting on the suggestion of Loubriel, a fellow contractor and friend, Ventura sought out Rivera, an

---

[2]Ventura purchased materials for his various construction projects from the United States mainland.

executive assistant to the Governor of Puerto Rico.  Rivera offered to help Ventura gain access to government officials with authority to issue the permits his projects required.  On several occasions in 1997, Ventura asked for Rivera's help, and she responded by calling government officials and arranging meetings between the officials and Ventura or asking the officials "to try to help [him] out."  Government officials were receptive to Rivera because, as one official explained, "she was the assistant to the Governor, . . . and [they] expect[ed] that all the calls that she made . . . were on behalf of the Governor."  Initially, Rivera made no demand for payment from Ventura for her assistance.

Then, one evening in early 1998, Ventura ran into Rivera at a supermarket across the street from his office and invited her back to his office.  While there, Rivera complained to Ventura "that she had too many expenses and that her salary was never enough for her to be able to meet [her expenses]."  Rivera said she hoped "some friends could help her out."  Ventura testified that he interpreted Rivera's statements as a demand that she be paid for her continued assistance.  Ventura said that he agreed to pay Rivera between $3,000 and $5,000 per month because he

> realized that having received a proposition
> from someone who had so much influence and so
> much power, to deny it would be putting at
> risk a lot of [his] ability to generate
> business. . . . [W]ith all the influence and
> power that she had, she had the power to help
> [him] and likewise she could [have] cause[d

-4-

him] harm because she [had] access to all of the offices of the government.[3]

Soon thereafter, Ventura and Rivera began a romantic relationship, which lasted only a few months. That relationship had no impact on Ventura and Rivera's "business" arrangement.

In early 1999, Ventura met with Arbona, Loubriel, and Ocasio. At that time, Rivera was independently helping all four contractors.[4] Arbona explained to the other three that Rivera had demanded that she be paid $6,000 per month for her assistance. The contractors each agreed to pay Rivera $1,500 per month.[5] Ventura later asked Rivera whether he could deduct $1,500 from the amount he had previously agreed to pay her each month. Rivera refused, and from then on, Ventura paid her $4,500 to $6,500 per month.

---

[3]Ventura obtained the money he used to pay Rivera by inflating the invoices he sent to the government in connection with his government contracts.

[4]In addition to setting up meetings between the contractors and government officials, Rivera would also call officials to expedite matters for the contractors, including the payment of invoices and the relaxation of construction requirements.

[5]Ocasio, who by 1999 had already been paying Rivera on a regular basis for her assistance for several years, explained that he did so because, after he left his government position, he did not have influence over government officials and she wielded tremendous influence. In fact, he stated that "[a]ny phone call coming in from her was construed as having the support of [the Governor] . . . ." Ocasio likened Rivera's power within the government to that of "a bull dozer . . . that [could] just take out anything that is [i]n its way," and he testified that she helped him obtain government contracts by "mak[ing] phone calls to [government officials] to facilitate the process."

As a result of these activities, Rivera was charged under the Hobbs Act with conspiracy to interfere with commerce by extortion induced by fear of economic harm and under color of official right, as well as aiding and abetting the underlying offense. After a jury found Rivera guilty on both counts, she filed a motion for a judgment of acquittal and, in the alternative, a new trial. The district court awarded Rivera a judgment of acquittal and, alternatively, if that judgment were reversed on appeal, a new trial.

The district court granted the judgment of acquittal based on its conclusion that, on the evidence produced at trial, Rivera could not have been found guilty of the charged crimes, as she could not have been found to have committed extortion. The district court conditionally awarded Rivera a new trial because it felt that the government had not presented sufficient evidence to support the verdict and had violated its obligations under Brady v. Maryland, 373 U.S. 83 (1963), which requires that the government disclose all evidence in its possession that is both material and exculpatory.

The Brady violation was predicated on the government's alleged failure to disclose a plea agreement it had entered into with Ocasio. The district court reasoned that Ocasio, who pleaded guilty shortly before trial, must have entered into a plea agreement because he met with government prosecutors prior to

-6-

pleading guilty and the government moved for a downward departure at his sentencing hearing.  The district court found the existence of a plea agreement despite Ocasio's insistence at trial that he had not entered into any such agreement, and affidavits of the government's two trial prosecutors and a Federal Bureau of Investigation ("FBI") agent to that same effect.[6]

The government now seeks review of the grant of the judgment of acquittal and the conditional new trial.

## II.  Judgment of Acquittal

We review the grant of a motion for judgment of acquittal de novo.  See United States v. Hernandez, 146 F.3d 30, 32 (1st Cir. 1998).  In reviewing such a grant, we must consider "all the evidence, direct and circumstantial, in the light most favorable to the prosecution, drawing all reasonable inferences consistent with the verdict, and avoiding credibility judgments, to determine whether a rational jury could have found guilt beyond a reasonable

---

[6]The district court also stated that, in light of the government's alleged failure to disclose the plea agreement, it was "very troubled" by an allegation that the government had failed to disclose a notebook in which Ventura purportedly listed illegal payments he had made to various government officials. However, the district court did not base its finding of a Brady violation on this allegation, and consequently, we need not address it to resolve this appeal. Nevertheless, we note that even if there were evidence that the notebook existed and that the government had it in its possession (and we have been presented with none), that evidence would not have been sufficient to support a Brady violation, as the information allegedly contained in the notebook was cumulative of that which Rivera already possessed. See Conley v. United States, 323 F.3d 7, 30 (1st Cir. 2003).

doubt." Llinas, 373 F.3d at 30 (internal quotation marks omitted).
So long as "the guilty verdict finds support in a plausible
rendition of the record," it must be allowed to stand (and the
acquittal must be reversed). United States v. Rivera-Ruiz, 244
F.3d 263, 266 (1st Cir. 2001) (internal quotation marks omitted).

The district court awarded the judgment of acquittal
because it concluded that, on the evidence presented at trial, no
rational jury could have found Rivera guilty of extortion either
through fear of economic loss or under color of official right. We
disagree; the evidence was sufficient to prove extortion under both
theories.

Under the Hobbs Act, "Whoever in any way or degree
obstructs, delays, or affects commerce or the movement of any
article or commodity in commerce, by . . . extortion or attempts or
conspires so to do . . . shall be [punished]." 18 U.S.C. §
1951(a). "[T]he government need only show a realistic probability
of a de minimis effect on interstate commerce[] in order to bring
extortion within the reach of the Hobbs Act." United States v.
Rivera-Medina, 845 F.2d 12, 15 (1st Cir. 1988); see United States
v. Hathaway, 534 F.2d 386, 396 (1st Cir. 1976) ("The Hobbs Act . .
. has . . . been held to reach even those effects which are merely
potential or subtle." (internal quotation marks and citation
omitted)). Extortion is defined as "the obtaining of property from
another, with his consent, induced by wrongful use of . . . fear,

-8-

or under color of official right." 18 U.S.C. § 1951(b)(2). "Fear" encompasses "fear of economic loss, . . . including the possibility of lost business opportunities." United States v. Bucci, 839 F.2d 825, 827-28 (1st Cir. 1988) (internal quotation marks and citation omitted). Thus, an individual commits extortion if he obtains property from another, with the other's consent, either through fear of economic loss or under color of official right.

A.        Extortion Through Fear of Economic Loss

We first address whether there was sufficient evidence to prove extortion through fear of economic loss. To establish extortion through fear of economic loss, the government must "show that the victim believed that economic loss would result from his . . . failure to comply with the alleged extortionist's terms, and that the circumstances . . . rendered that fear reasonable." Id. at 828; see United States v. Capo, 817 F.2d 947, 951 (2d Cir. 1987) (en banc) ("[T]he proof need establish that the victim reasonably believed: first, that the defendant had the power to harm the victim, and second, that the defendant would exploit that power to the victim's detriment." (emphasis in original)). Significantly, the loss feared must be "a particular economic loss, not merely the loss of a potential benefit." United States v. Edwards, 303 F.3d 606, 635 (5th Cir. 2002); see United States v. Garcia, 907 F.2d 380, 385 (2d Cir. 1990) (reversing an extortion conviction where the jury was permitted to consider the theory of fear of economic

-9-

loss because the evidence "did not establish that the company acted out of fear that without these payments it would lose existing contracts or even opportunities to which it was legally entitled").

We think that the evidence regarding Ventura alone was sufficient to establish extortion induced by fear of economic loss. There was ample evidence that Ventura feared that he would suffer economic loss if he failed to pay Rivera. Ventura testified that he began paying Rivera $3,000 to $5,000 per month in 1998 because he feared that if he did not, he "would be putting at risk a lot of [his] ability to generate business." Ventura believed that "with all the influence and power that [Rivera] had, she had the power to help [him] and likewise she could [have] cause[d him] harm." The fact that Ventura reluctantly agreed to pay Rivera an additional $1,500 per month in 1999 further supports the finding that Ventura acted out of a fear of economic loss and that this was "not a situation . . . in which [Ventura] w[as] merely attempting to obtain preferential access and thought that, even without the payments, [he] would have a fair opportunity to [obtain permits]." Edwards, 303 F.3d at 636; compare United States v. Collins, 78 F.3d 1021, 1030 (6th Cir. 1996) ("[T]he evidence in this case was sufficient to establish that [the victims] acted out of fear that without the payments they could lose the opportunity to compete for government contracts on a level playing field. . . . They paid out of a fear that unless they paid money to Defendant . . . , they

-10-

would forfeit any potential business opportunity with the [state]."), with Capo, 817 F.2d at 952-54 (reversing a finding of extortion through fear of economic loss because the victims did not act out of fear of the harm the defendants might inflict upon them if they refused to pay; rather, they were seeking to secure the defendants' assistance to improve their chances of obtaining jobs). And, given Rivera's access to, and influence over, the officials who decided whether to grant the permits Ventura needed, we cannot say that Ventura's fear was unreasonable.[7]

B.        Extortion Under Color of Official Right

We turn now to the issue of whether the evidence was sufficient to prove extortion under color of official right. To

---

[7]Although the district court found it significant that Ventura initiated the meeting that resulted in the monthly payments to Rivera, that fact was irrelevant to the central issue of whether there was ample evidence for the jury to conclude that Ventura reasonably believed that he would suffer economic loss if he refused to pay Rivera. See Rivera-Medina, 845 F.2d at 14 ("The fact that [the victim] approached [the extorter] first does not mean that extortion did not occur."). The district court also emphasized that Ventura suffered no personal loss as a result of his arrangement with Rivera because he obtained the money that he used to pay Rivera by inflating the invoices he sent to the government in connection with his government contracts. But, that fact also had no bearing on whether there was sufficient evidence to support the finding that Ventura paid Rivera to avoid losing the ability to obtain government permits. In addition, we note that it is immaterial that Rivera never explicitly threatened Ventura, see Bucci, 839 F.2d at 828 (holding that it is enough if the victim "understood the defendant's conduct as an implied threat"), and that the two had a friendly--and even for a time intimate-- relationship, see United States v. Rastelli, 551 F.2d 902, 905 (2d Cir. 1977) ("The fact that relations between the victims and the extorters were often cordial is not inconsistent with extortion." (internal quotation marks omitted)).

-11-

prove extortion under color of official right, "the Government need only show that a public official has obtained a payment to which he was not entitled, knowing that the payment was made in return for official acts."  Evans v. United States, 504 U.S. 255, 268 (1992); see United States v. Cianci, 378 F.3d 71, 99 (1st Cir. 2004).

The jury could have found that the evidence presented concerning Ventura was itself sufficient to establish extortion under color of official right.  There is no dispute that Rivera was a public official[8] who obtained payments to which she was not entitled with the understanding that the payments were made in return for her assisting Ventura with his government business, that is, in return for her calling government officials in her official capacity and requesting that they meet with Ventura or "try to help [him] out."  However, Rivera argues, and the district court implicitly found, that those calls were not "official acts" and, thus, she could not have committed extortion under color of official right.  We disagree.  Rivera made the calls from her government office and in her official capacity as executive assistant to the Governor of Puerto Rico, and therefore, the calls were official acts.[9]  Because Rivera was paid to use her official

---

[8]See United States v. Freeman, 6 F.3d 586, 593 (9th Cir. 1993) ("[T]he Hobbs Act reaches anyone who actually exercises official powers, regardless of whether those powers were conferred by election, appointment, or some other method.").

[9]Indeed, had Rivera made the calls in her personal capacity, it is unlikely that she would have gotten the desired results.

powers to further Ventura's interests, the jury could reasonably have found her guilty of extortion under color of official right. See United States v. Freeman, 6 F.3d 586, 593-94 (9th Cir. 1993) ("Because the evidence demonstrates that [defendant] possessed and misused official powers in connection with his [official] position . . . , we hold that a rational trier of fact could have found the essential elements of the crime of official right extortion beyond a reasonable doubt." (internal quotation marks and alteration omitted)); United States v. Loftus, 992 F.2d 793, 796 (8th Cir. 1993) ("In this case, we consider whether [defendant] promised to use his official position . . . to serve the bribe-giver's interests.").

We note that it is irrelevant that Rivera lacked (and that Ventura knew she lacked) the ultimate authority to issue permits or otherwise affect his government business; Rivera, in her official capacity, had the power to facilitate Ventura's government business, and it was that power that Ventura paid her to exercise. Loftus, 992 F.2d at 796 ("Actual authority over the end result . . . is not controlling if [defendant], through his official position, had influence and authority over a means to that end."). Furthermore, there can be no question that Rivera's actions had the requisite "realistic probability of a de minimis effect on

_____

Government officials assumed "that all the calls that [Rivera] made . . . were on behalf of the Governor."

interstate commerce" to implicate the Hobbs Act.  Rivera-Medina, 845 F.2d at 15.  Ventura purchased materials for his construction projects from the mainland United States, and it was reasonable for him to conclude that had he not paid Rivera, she may have used her influence to cause his business to suffer.  Rivera's actions thus had a "realistic probability" of affecting interstate commerce because, had Ventura refused to pay, Rivera may have caused his business to suffer and, in so doing, indirectly caused him to purchase fewer materials from the mainland United States.  See United States v. Jarabek, 726 F.2d 889, 901 (1st Cir. 1984) (noting "that the requisite interstate commerce nexus could be established if the jury found that, unless the victim gave in to the extortionate demands, the victim's business might have been hindered or destroyed, thereby halting or reducing interstate movement of material to the victim's business.").

Because there was sufficient evidence to prove extortion both through fear of economic harm and under color of official right, we find that the district court erred in granting Rivera's motion for a judgment of acquittal.

### III.  Conditional New Trial

Having determined that the district court erred in granting Rivera's motion for a judgment of acquittal, we now consider whether it also erred in conditionally awarding Rivera a new trial.  The district court granted a new trial based on its

-14-

belief that the evidence presented to the jury was insufficient to support Rivera's convictions and the government violated <u>Brady</u> v. <u>Maryland</u>, 373 U.S. 83 (1963), by failing to turn over to Rivera impeachment evidence that was in its possession.[10] A district court may award a new trial pursuant to the government's failure to meet its disclosure obligations under <u>Brady</u> if the defendant demonstrates that

> (1) the evidence at issue is material and favorable to the accused; (2) the evidence was suppressed by the prosecution; and (3) [he] was prejudiced by the suppression in that there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.

<u>United States</u> v. <u>Conley</u>, 249 F.3d 38, 45 (1st Cir. 2001) (internal quotation marks omitted). We "review a district court's decision on a motion for a new trial . . . for manifest abuse of discretion." <u>Id.</u> at 44 (citation omitted).

There are, however, "definite limits upon a district court's right to upset a jury verdict." <u>United States</u> v. <u>Rothrock</u>, 806 F.2d 318, 322 (1st Cir. 1986). A district court "judge is not a thirteenth juror who may set aside a verdict merely because he would have reached a different result." <u>Id.</u> Thus, where the award

---

[10]"Under <u>Brady</u>, the government is required to produce to defendants exculpatory and impeachment evidence that is in its custody, possession, and control . . . ." <u>United States</u> v. <u>Wall</u>, 349 F.3d 18, 22 n.6 (1st Cir. 2003) (internal quotation marks and citation omitted).

of "a new trial is predicated on the district court's evaluation of the weight of the evidence rather than its concern about the effect of prejudicial acts that may have resulted in an unfair trial, . . . it [must be] quite clear that the jury has reached a seriously erroneous result."  Id. (internal quotation marks and citation omitted).

We first review the propriety of the district court's grant of a new trial pursuant to its belief that the evidence was insufficient to support the verdict.  We have already determined that there was ample evidence to support the verdict.  Therefore, because it is not "clear that the jury . . . reached a seriously erroneous result," id. (internal quotation marks omitted), we find that the district court manifestly abused its discretion in awarding Rivera a new trial.

We next address whether the district court was justified in awarding Rivera a new trial based on the government's alleged failure to meet its obligations under Brady, that is, its alleged failure to disclose that it had entered into a plea agreement with Ocasio.  The grant of a new trial on this ground was unjustified. Even if there were no question as to the existence of the plea agreement (and there is, in fact, a serious question on that issue),[11] we think that it was a manifest abuse of discretion to

---

[11]The district court surmised that Ocasio entered into a plea agreement because he met with government prosecutors prior to pleading guilty and the government moved for a downward departure

-16-

find that there was a reasonable probability that Rivera would have been acquitted had the agreement been disclosed. See Conley, 249 F.3d at 45 (noting that "where a defendant claims that . . . evidence should have been produced under Brady[,] . . . the defendant must establish that . . . had the evidence been disclosed . . . , the result of the proceeding would have been different" (internal quotation marks omitted)). This is because even if the jury had ignored all evidence pertaining to Ocasio, there was still ample evidence relating to Rivera's relationship with Ventura to convict.

**Reversed and remanded with the instruction that the jury verdict be reinstated and for proceedings consistent with this opinion.**

---

at his sentencing hearing. But, Ocasio insisted at trial that he had not entered into any such agreement, and the government's two trial prosecutors, as well as an FBI agent, submitted affidavits to that same effect. Thus, the district court's finding that Ocasio entered into a plea agreement was entirely at odds with the only evidence--which was in the form of sworn statements--that had been offered on the subject, and as a result, it was unjustified. See Moreno-Morales v. United States, 334 F.3d 140, 146 (1st Cir. 2003) ("From the evidence presented, we cannot make the leaps necessary to support [appellant's] conclusory assumption[s].").