UNITED STATES of America, Appellee,

v.

Dean LOFTUS, Appellant.

No. 92–1330.

United States Court of Appeals, Eighth Circuit.

Submitted Oct. 16, 1992.

Decided May 4, 1993.

Lawrence F. Scalise, Des Moines, IA, argued (Lawrence F. Scalise and Donald L. Carr, II, on the brief), for appellant.

Jan W. Sharp, Omaha, NE, argued (Ronald D. Lahners, on the brief), for appellee.

Before McMILLIAN, MAGILL, and HANSEN, Circuit Judges.

MAGILL, Circuit Judge.

Dean Shannon Loftus appeals from a final judgment finding him guilty, upon a jury verdict, of extortion under color of official right, in violation of the Hobbs Act, 18 U.S.C. § 1951. Loftus claims (1) the evidence was insufficient to sustain the jury's verdict and the trial court[1] erred by denying his motion for judgment of acquittal; (2) the court incorrectly instructed the jury regarding entrapment; and (3) the court incorrectly applied the Sentencing Guidelines when it enhanced his offense level. We affirm.[2]

## I. BACKGROUND

In November 1987, Loftus was elected to a four-year term on the Board of County Commissioners of Sarpy County, Nebraska. Loftus had been friends with an individual named William Monson since childhood. Monson is a licensed private investigator who

1. The Honorable Lyle E. Strom, Chief Judge, United States District Court for the District of Nebraska.

2. Before oral argument, we agreed to take the government's motion to supplement the trial record under consideration. That motion is hereby granted.

has been working as an informant for the FBI for many years.

In April 1990, Monson reported to the FBI that Loftus had told him he was willing to support a road needed by a developer only if he was given a fee. In May 1991, the FBI opened a public corruption investigation of Loftus. This investigation resulted in a "sting" operation involving a shopping center development proposed by Jay Lerner (the Lerner project). The property upon which the shopping center would sit was outside the city limits of Bellevue, Nebraska, but was subject to city zoning regulations. Construction of the shopping center would thus require city rezoning. The property and the city of Bellevue are located in Sarpy County.

After Lerner proposed the shopping center development and applied for rezoning, significant citizen opposition developed, primarily focusing on safety concerns because an elementary school was located across the street. The Bellevue Planning and Zoning Commission eventually recommended to the Bellevue City Council that they deny the application for rezoning. Lerner put his request for rezoning on indefinite hold, which provided the framework for the FBI's sting. Monson worked with the FBI in the sting.

On June 25, in a tape recorded conversation, Monson met with Loftus and told him he knew a silent partner in the Lerner project and the partners were still interested in having the property rezoned for the shopping center. At the meeting, Loftus indicated to Monson that he would be interested in the project if he made some cash. Monson offered to approach the silent partner on Loftus' behalf.

On July 11, in a recorded conversation, Monson told Loftus the silent partner was still interested, and Loftus said he would work on the project for $25,000. He also told Monson he wanted to work through Monson because "[i]f they're handing me something directly then they've got me." He stated he would speak to the Bellevue City Council, work the citizen opposition, and come out in the press in support of the project. He indicated that the city council was looking for a "push" from the Sarpy County Commissioners.

The FBI instructed Monson to offer Loftus $20,000, with $5,000 up front and the balance to be paid following rezoning by the city council. In a recorded conversation on July 18, Monson told Loftus that he had the deal. Afterwards, also in a recorded conversation, Loftus told Monson that he wanted to back out because a grand jury was convening and it might investigate allegations that Sarpy County Commissioners were taking bribes. Loftus stated he would consider the project again in thirty days depending on the progress of the grand jury.

On October 9, Monson resumed recorded contact with Loftus. Loftus indicated his ability to influence the city council concerning the rezoning would come from his ability to trade political favors. He also stated he was still interested in being involved in the Lerner project. In a meeting on December 11, Loftus stated he had already taken steps to allay some of the concerns raised in opposition to the project, and had made promises to improve the street upon which the project site was located, which would alleviate the safety concerns. When asked if he would be involved in the project in the absence of a payoff, Loftus replied that he didn't care about the project and "they have to make it my baby."

On December 13, Loftus told Monson in a recorded conversation that obtaining votes from the city council necessary to rezone the property would simply be a matter of swapping intergovernmental favors. He stated he would have leverage because the city would need approval for other projects from the county at some point in the future. He also noted that the president of the city council "works for me at the county," and he already had county engineers working on the street problems.

Loftus came to Monson's house unannounced on December 19, and asked for the money. On December 20, in an audio and video taped meeting, Loftus took $5,000 from Monson and put it in his pants. At the FBI's direction, Monson told Loftus to temporarily refrain from taking any action.

Sometime in the next few months, an FBI agent posing as the silent partner had a telephone conversation with Loftus, in which

·Loftus stated that county work was being done on the road connected with the Lerner project. During a tape recorded meeting with another FBI agent, also posing as the silent partner, Loftus stated the county surveyor was working on the project.

Loftus was interviewed by the FBI on March 5, 1991. He subsequently was indicted, and after a jury trial, was found guilty of extortion under color of official right in violation of the Hobbs Act, 18 U.S.C. § 1951. The trial court sentenced Loftus to twenty-one months imprisonment, two years supervised release, and $50 special assessment.

## II. DISCUSSION

### A. Hobbs Act

 Loftus argues the evidence presented by the government was insufficient to sustain the jury's verdict, and therefore the court erred when it denied his motion for judgment of acquittal. We view the evidence presented in the light most favorable to the government, and uphold the verdict if there is substantial evidence to support it. *United States v. Schubel,* 912 F.2d 952, 955 (8th Cir.1990). The standard to be applied in determining the sufficiency of the evidence is strict, and the finding of guilt should not be overturned lightly. *Id.*

The Hobbs Act, in part, defines extortion as "the obtaining of property from another, with his consent ... under color of official right." 18 U.S.C. § 1951(b)(2). When a public official accepts money and "asserts that his official conduct will be controlled by the terms of the promise or undertaking," that official has received money "under color of official right within the meaning of the Hobbs Act." *McCormick v. United States,* — U.S. —, —, 111 S.Ct. 1807, 1816, 114 L.Ed.2d 307 (1991).

Loftus contends the government did not prove he received the $5,000 payment under color of official right. He first argues that the government must prove either that he had the authority over the rezoning process or that the partners in the Lerner project believed he could cause the property to be rezoned. He points out that the rezoning of the property was strictly a city function, and

as a county commissioner he had no authority over city functions.

Loftus cites to *United States v. Rabbitt,* 583 F.2d 1014 (8th Cir.1978), *cert. denied,* 439 U.S. 1116, 99 S.Ct. 1022, 59 L.Ed.2d 75 (1979), to support this argument. In *Rabbitt,* a member of the Missouri House of Representatives offered, for a fee, to introduce an architectural firm to people who might be able to secure for the firm contracts for state construction work. This court reversed the conviction because the defendant did not have the actual authority to award the contracts and the architectural firm did not possess a reasonable belief in the defendant's apparent power to do so. *Rabbitt,* 583 F.2d at 1028. The court noted the firm knew the most the official could do was "gain them a friendly ear." *Id.* at 1028.

*Rabbitt,* however, is distinguishable from the facts of this case. The official in *Rabbitt* promised only to introduce the firm to influential persons; he did not promise to use his official position to influence those persons. In this case, we consider whether Loftus promised to use his official position as county commissioner to serve the bribe-giver's interests. *See Evans v. United States,* — U.S. —, —, 112 S.Ct. 1881, 1884, 119 L.Ed.2d 57 (1992). Actual authority over the end result—rezoning—is not controlling if Loftus, through his official position, had influence and authority over a means to that end. *See United States v. Harding,* 563 F.2d 299, 307 (6th Cir.1977), *cert. denied,* 434 U.S. 1062, 98 S.Ct. 1235, 55 L.Ed.2d 762 (1978).

The government introduced evidence indicating Loftus did intend to use his position as county commissioner to influence the city council to rezone the property. Loftus, in taped conversations with Monson, indicated he would pressure city councilmen to vote for the Lerner project by reminding them they would need county approval in the future for other projects. Other evidence indicated Loftus was willing to use his position with the county to pressure one of the city councilmen who worked for the county. Additionally, Loftus stated on tape that allaying the safety concerns regarding traffic problems in the area was a condition precedent to any rezoning action. County action would be

needed to deal with some of those safety concerns, and Loftus stated he would improve the street involved to address those concerns. Indeed, the government introduced evidence which demonstrated Loftus did begin, as county commissioner, to allay traffic concerns by having no parking signs installed. Additionally, he took the county surveyor to the site twice to inspect it.

Loftus also contends he agreed only to lobby on behalf of the Lerner Corporation. However, evidence showed that Loftus himself stated hiring him as a consultant or lobbyist would not be sufficient because "then I can't use the county. I can't use my title."

Loftus further argues when he accepted the money he was instructed to do nothing, and so was not asked to misuse his office for his private benefit. Evidence introduced at trial, however, demonstrated Loftus was not told to never take any action; he was told to wait. The tape of the conversation between Monson and Loftus when he accepted the money indicates Loftus understood he was to take action at a later time. Furthermore, evidence of previous meetings between Monson and Loftus indicate Loftus intended to use his position as county commissioner when taking that action. We note that actually taking action is not an element of the offense, and "the Government need only show that a public official has obtained a payment to which he was not entitled, knowing that the payment was made in return for official acts." *Evans*, — U.S. at —, 112 S.Ct. at 1889.

We find the government presented sufficient evidence at Loftus' trial to support the jury's verdict of guilty.

**3.** Instruction No. 15 read as follows:

If the Defendant did not have any previous intent or disposition to commit the crime charged, and was induced or persuaded by law enforcement officers or their agents to commit that crime, he was entrapped. On the other hand, if the defendant did have a previous intention or disposition to commit the crime charged, then he was not entrapped, even though law enforcement officers or other agents provided a favorable opportunity to commit the crime, or made committing the

## B. Entrapment Defense

■ Loftus next argues the court erred in instructing the jury regarding entrapment and he was entrapped as a matter of law.

Loftus specifically accepted instruction number 15[3] defining entrapment before it was given to the jury. During deliberation, the jury asked the court whether "previous intent or disposition to commit the crime" meant "before the sting operation began or any time up to acceptance of $5000." The court proposed and submitted to the jury an answer, to which Loftus objected. After further research, and before the jury reached its verdict, the court submitted a corrected answer to the jury.[4] This corrected answer addressed the objections Loftus had raised to the original answer. Loftus did not object to the corrected answer.

■ Because Loftus did not object to the corrected answer at trial, we review under a plain error standard. *United States v. Neumann*, 887 F.2d 880, 882 (8th Cir.1989), *cert. denied*, 495 U.S. 949, 110 S.Ct. 2210, 109 L.Ed.2d 536 (1990). We will find plain error only when a miscarriage of justice would result. *Id.*

■ Loftus asserts the jury should have been instructed that the government must prove that Loftus was predisposed to commit the criminal act prior to initiation of the sting operation. The corrected answer instructed the jury that the government must prove the defendant was predisposed "prior to the time you find he was induced to commit the crime." Under a recent Supreme Court case, *Jacobson v. United States*, — U.S. —, 112 S.Ct. 1535, 118 L.Ed.2d 174 (1992), this instruction was incorrect. When the government is required to prove predisposition, they must prove "the defendant was

crime easier, or even participated in acts essential to the crime.
Appellant's Br. at 13.

**4.** The corrected answer was as follows:

The reference to previous intent or disposition to commit the crime charged as set forth in Instruction No. 15 means that the government must prove beyond a reasonable doubt that the defendant had such intent or disposition prior to the time you find he was induced to commit the crime which has been charged in the indictment.

disposed to commit the criminal act prior to first being approached by Government agents." *Id.* —— U.S. at ——, 112 S.Ct. at 1540.

Although erroneous, this instruction did not cause a miscarriage of justice. The complete holding in *Jacobson* states: "Where the Government has induced an individual to break the law and the defense of entrapment is at issue ... the prosecution must prove beyond reasonable doubt that the defendant was disposed to commit the criminal act prior to first being approached by Government agents." *Id.* at ——, 112 S.Ct. at 1540. Under *Jacobson,* therefore, the prosecution is not required to prove predisposition unless the government has induced the defendant to commit the offense. *Accord United States v. Van Slyke,* 976 F.2d 1159, 1162 (8th Cir.1992) (stating the burden is on the defendant first to present evidence of inducement).

Loftus cannot establish inducement by showing simply that " 'the government solicited, requested or approached [him] to engage in criminal conduct.' " *Id.* (quoting *United States v. Young,* 954 F.2d 614, 616 (10th Cir.1992)). Rather, Loftus must demonstrate "government conduct that 'creates a substantial risk that an undisposed person or otherwise law-abiding citizen would commit the offense.' " *United States v. Stanton,* 973 F.2d 608, 609 (8th Cir.1992) (quoting *United States v. Mendoza–Salgado,* 964 F.2d 993, 1004 (10th Cir.1992)).

The record does not demonstrate that the government conduct created such a substantial risk. Tapes of the conversations between Loftus and Monson show that Monson simply approached Loftus and presented Loftus with the opportunity to commit a crime. After being presented with this opportunity, Loftus demonstrated a ready willingness to participate in actions he knew were criminal. When Loftus later expressed concern about the grand jury, Monson asked Loftus if he wanted to back out. He exerted no pressure on Loftus to pursue the opportunity. After Loftus no longer considered the grand jury a concern, Monson simply reminded him of the Lerner project and Loftus again was ready and willing to commit criminal actions. Monson's behavior cannot be

interpreted as rising to such a level that an "otherwise law-abiding citizen would commit the offense." *Id. Compare Van Slyke,* 976 F.2d at 1162 (finding insufficient evidence of inducement when defendant testified he had succumbed to agent's requests for drugs because agent was a friend) *and United States v. Huff,* 959 F.2d 731, 737 (8th Cir.) (finding insufficient evidence that government implanted criminal plan in defendant's mind and induced defendant when evidence demonstrated police agent pretended he had previously met defendant, set attractively low price on cocaine, gave defendant sample of cocaine to test, insisted on dealing in particular place, gave defendant money for gas; agents appeared as legitimate drug dealers; and the cocaine was 97.2% pure), *cert. denied,* —— U.S. ——, 113 S.Ct. 162, 121 L.Ed.2d 110 (1992) *with United States v. Sullivan,* 919 F.2d 1403, 1418–19 (10th Cir. 1990) (finding evidence of inducement when agent repeatedly entreated one defendant to commit crime in order to alleviate agent's desperate situation and defendant reluctantly agreed to accompany agent; other defendants were tricked to go to drug lab and were unable to leave lab; and government had supplied most of equipment and a necessary chemical for lab).

Because the record shows insufficient evidence to establish inducement, it is unnecessary for the government to prove Loftus' predisposition. *See Van Slyke,* 976 F.2d at 1162. The government did, however, introduce evidence of Loftus' disposition to commit the offense which existed prior to contact with government agents. Monson testified that before the FBI began its investigation, Loftus told Monson he was willing to support a road needed by a developer only if he would get something in return. This evidence, combined with Loftus' ready willingness to participate in backing the Lerner project and his desire to work through Monson to protect himself from getting in trouble with the law, demonstrates Loftus' disposition to commit the offense. *See Jacobson,* —— U.S. at ——, 112 S.Ct. at 1541 (stating that ready commission of criminal act demonstrates predisposition when defendant commits crime after simply being presented with opportunity in a "sting" operation).

We find no miscarriage of justice resulting from error in the answer given to the jury.

### C. Sentencing Enhancement

■ Finally, Loftus claims the trial court erred when it increased his base offense level under U.S.S.G. § 2C1.1(b)(2). We review interpretation of the Sentencing Guidelines de novo. *United States v. Lamere*, 980 F.2d 506, 514 (8th Cir.1992).

■■ Barring ex post facto concerns, the Sentencing Guidelines in effect at the time of sentencing control. *United States v. Johnston*, 973 F.2d 611, 613 n. 2 (8th Cir.1992), cert. denied, —— U.S. ——, 113 S.Ct. 1019, 122 L.Ed.2d 165 (1993). If a guideline is amended after the defendant's crime, but before sentencing, and the amendment increases his offense level, the guidelines in effect at the time of the crime control. *Id.*

The 1990 guidelines were in effect at the time Loftus committed the offense; the 1991 guidelines were in effect at his sentencing. U.S.S.G. § 2C1.1(b)(2)(B) (1990) causes the offense level to be increased by eight levels "[i]f the offense involved a bribe for the purpose of influencing an elected official...." The 1991 version of this section changes the word "bribe" to "payment." Loftus contends that under the 1990 version, the offense level should be enhanced only when the offense of bribery is involved, not extortion. He claims the sentencing commission, by changing the language in the 1991 version, changed the section to apply the enhancement to both bribery and extortion. Therefore, he argues, the 1990 Sentencing Guidelines apply to his sentencing, and under this version his offense level should not be enhanced. We disagree.

We believe that the 1991 amendment to this section merely clarified the meaning of the 1990 version, and did not make a substantive change to the offenses to which the section applies. The enhancement would apply to Loftus' offense of extortion under either version. While the word "bribe" is used throughout this section in the 1990 version, the commentary indicates the section applies to extortion under the Hobbs Act. The commentary specifically references 18 U.S.C. § 1951, which is the statute under which

Loftus was convicted. *See* U.S.S.G. § 2C1.1 (backg'd) (Nov. 1990); *see also* U.S.S.G. § 2C1.1 (backg'd) (Nov. 1991) (referencing 18 U.S.C. § 1951). Additionally, the commentary states that "[s]ection 2C1.1 also applies to extortion by officers or employees of the United States in violation of ... Hobbs Act extortion, or attempted extortion, under color of official right, in violation of 18 U.S.C. § 1951. The Hobbs Act ... applies in part to any person who acts 'under color of official right.' This statute applies to extortionate conduct by, among others, officials and employees of state and local governments." U.S.S.G. § 2C1.1 (backg'd) (Nov. 1990); *see* U.S.S.G. § 2C1.1 (backg'd) (Nov. 1991) (stating same). We also note that both the 1990 and the 1991 versions of this section are titled "Offering, Giving, Soliciting, or Receiving a Bribe: Extortion Under Color of Official Right."

By specifically referring to extortion under the Hobbs Act in the commentary, we believe the sentencing commission demonstrated its intention that the 1990 version of § 2C1.1(b)(2) apply to the offense of extortion. The 1991 amendment merely clarified their intention. The trial court correctly enhanced Loftus' sentence under this section.

### III. CONCLUSION

We find no reversible error and find sufficient evidence to support the jury's verdict of guilty. Therefore, we affirm.

McMILLIAN, Circuit Judge, dissenting.

I do not agree with the majority opinion's conclusion that Loftus's acceptance of $5,000.00 violated the Hobbs Act, 18 U.S.C. § 1951, and accordingly dissent.

I believe that the outcome of this case turns on one issue: whether Loftus obtained the $5,000.00 in exchange for the performance or nonperformance of his official acts as a County Commissioner. In a Hobbs Act prosecution of a public official, the government must prove beyond a reasonable doubt that the public official obtained a payment from another in exchange for performance or nonperformance of his or her official duties. *United States v. O'Keefe*, 825 F.2d 314, 319

(11th Cir.1987); *United States v. French*, 628 F.2d 1069, 1072 (8th Cir.1980). Receipt of such a payment is prohibited under the Hobbs Act only if the government can establish the existence of a *quid pro quo*, in other words, that the payment "is made in return for an explicit promise or undertaking by the official to perform or not to perform an official act." *McCormick v. United States*, — U.S. —, —, 111 S.Ct. 1807, 1816, 114 L.Ed.2d 307 (1991). Therefore, in order to establish a Hobbs Act violation, "the government need only show that [Loftus] has obtained a payment to which he was not entitled, knowing that the payment was made in return for official acts." *Evans v. United States*, — U.S. —, —, 112 S.Ct. 1881, 1889, 119 L.Ed.2d 57 (1992).

In the present case the government showed that Loftus had accepted a payment to which he was not entitled but failed to show that the payment was made in return for his official acts, that is as a county commissioner. The FBI agents acting as partners in the Lerner Project wanted to rezone the land in question from residential to commercial use. The rezoning of land was strictly a function of the City Council and the City Planning and Zoning Commission. There was no evidence presented at trial that Loftus, a County Commissioner, had either the power to effect the desired rezoning or that the Lerner partners believed that he had such ability.

Furthermore, there was no evidence that Loftus took, or had ever taken in the past, any action which had influenced the City Council or the Planning and Zoning Commission to act or refrain from action in other matters. On the contrary, the Mayor of Bellevue testified that she had several meetings with Loftus which were attended by several current and past Council members. The Mayor testified that the land in question was discussed at these meetings but that Loftus never approached her or the City Council members concerning the rezoning of such land.

In *United States v. Rabbitt*, 583 F.2d 1014 (8th Cir.1978), this court was confronted with the same question at issue here. The defendant in *Rabbitt* was convicted of violating the Hobbs Act by accepting a commission fee from an architectural firm he had recommended to the State officials involved in awarding such contracts. In reversing the Hobbs Act conviction, this court determined that the evidence did not show that the defendant possessed the apparent power to award the state contract. *Id.* at 1028.

In *Rabbitt*, this court further concluded that the architectural firm knew that the defendant could not award the state contract, but could at most recommend them to state officials as qualified architects. *Id.* Thus, this court held that, absent evidence that any state architectural contract had been awarded to that firm as a result of the defendant's influence or that the firm reasonably believed that the defendant's introduction alone was enough to secure state architectural work, the government had failed to prove the firm entertained a reasonable belief that the defendant possessed effective control over the award of architectural contracts to establish extortion "under color of official right" in violation of the Hobbs Act. *Id.* at 1027–28.

The majority opinion distinguishes *Rabbitt* from the present case on the ground that the defendant in *Rabbitt* did not promise to use his official position to influence the persons granting the contracts, but only promised to introduce the architectural firm to influential persons. However, the majority's argument misses the mark. Under the holding in *Rabbitt*, it is irrelevant to a Hobbs violation analysis whether the official involved promised to use his or her official position to influence governmental decision or whether the official merely promised to introduce the party seeking favorable treatment to the government officials making the ultimate decisions; either way the official is still acting in an official capacity.

The focus in *Rabbitt* was whether "the extorted party possesses a reasonable belief in the official's power [to bring about the desired result]." *Rabbitt*, 583 F.2d at 1027; *see also United States v. Hathaway*, 534 F.2d 386, 394 (1st Cir.1976); *United States v. Mazzei*, 521 F.2d 639, 643 (3rd Cir.1975); *United States v. Braasch*, 505 F.2d 139, 151 (7th Cir.1974), *cert. denied*, 421 U.S. 910, 95 S.Ct. 1561, 1562, 43 L.Ed.2d 775 (1975). As

stated above, the government produced no evidence that Loftus had the power to effect the rezoning or that the Lerner partners reasonably believed that he had such influence or authority.

After reviewing the evidence in the light most favorable to the government, I cannot agree with the majority opinion's conclusion that the evidence presented at trial was sufficient to support the jury's verdict finding Loftus guilty of extortion under color of official right in violation of the Hobbs Act. I respectfully dissent.