**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Frederick E. SCOTT, Defendant–
Appellant.**

**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Joe J. RICHARD, Defendant–Appellant.**

**Nos. 93–2331, 93–2333.**

United States Court of Appeals,
Eighth Circuit.

Submitted Jan. 10, 1994.

Decided June 16, 1994.

Rehearing and Suggestion for Rehearing
En Banc Denied July 25, 1994 in
No. 93-2333.

John G. Schultz, Kansas City, MO, argued, for appellant Frederick E. Scott.

Michael S. Ketchmark, Kansas City, MO, argued, for appellant Joe J. Richard.

Bruce E. Clark, Kansas City, MO (Marietta Parker and Bruce E. Clark, on the brief), for appellee.

Before RICHARD S. ARNOLD, Chief Judge, HANSEN, Circuit Judge, and STOHR,* District Judge.

HANSEN, Circuit Judge.

Frederick E. Scott and Joe J. Richard appeal their convictions of conspiracy to possess with intent to distribute cocaine. Both defendants contend that the evidence was insufficient to support their convictions. Additionally, Scott contends that the district court[1] abused its discretion by refusing a discovery request and by making inappropriate comments at trial, and Richard contends that the government violated *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), and that he was denied his right to the effective assistance of counsel. We affirm.

## I.

The investigation culminating in Scott's and Richard's drug conspiracy convictions began in May of 1991. At that time, Richard was a patient at the infirmary of the United

---

* The HONORABLE DONALD J. STOHR, United States District Judge for the Eastern District of Missouri, sitting by designation.

1. The Honorable Joseph E. Stevens, Chief Judge, United States District Court for the Western District of Missouri.

States penitentiary in Leavenworth, Kansas. There he overheard a conversation between two fellow inmates, Robert Wilkey and Bill Megar, concerning narcotics trafficking in Texas and Florida. Richard entered into their discussion and told Wilkey that he would like to make contact with Wilkey's cocaine source. Richard, an African American, also told Wilkey that he dealt only with white partners with whom he had purchased cocaine from a source in Houston.

Unknown to Richard, Wilkey was cooperating with the Central East Texas Narcotics Task Force (Task Force). The Task Force had agreed to pay Wilkey a 10% commission based upon the street value of any drug deals he was able to arrange while in prison. Wilkey contacted the Task Force and relayed to them Richard's expressed interest in a drug transaction. The Task Force provided Wilkey with a beeper number to give to Richard under the pretense that it would enable Richard to contact Wilkey's paramour, "Paula", an alleged cocaine source in Houston. In reality, "Paula" was Rebecca Orchowski, an investigator for the Task Force. Shortly thereafter, Richard was released from prison.

In July 1991, Richard sent Wilkey, still an inmate, a letter stating that he did not intend to "open that business" at that time but also stating the following:

> But whenever the girls come up I will make sure they have a place to stay. In a month or so I will be able to pay part of their trip if they come up to see you. My uncle is going to help me open the business.

(Trial Tr. at 8.) Wilkey testified at trial that the "business" Richard referred to in the letter was the cocaine trafficking business, "the girls" referred to "Paula", and "my uncle" referred to Richard's white cocaine trafficking partner. (Id. at 9–11.) Wilkey explained that Richard used this cautious and guarded language to avoid detection by prison officials, knowing that prisoners' mail can be intercepted and read by prison authorities. Wilkey forwarded the letter to the Task Force along with a note stating, in part, "[a]ll you need to do is have a female call [Richard] and say she is Paula, Rusty's old

lady from Houston." (Id. at 12.) Wilkey's nickname in prison was Rusty.

On September 30, 1991, Wilkey called Richard from prison and asked if he had spoken to "Paula". Richard said he had not but also stated, "I haven't heard from her yet cause, ah, I got a friend of mine that goes down that way, you know." (Gov't App. at 31.) Wilkey testified that this statement referred to Richard's partner in the cocaine business who travelled to Houston for narcotics deals.

On October 21, 1991, Investigator Orchowski, representing herself as "Paula", called Richard and left her beeper number on his answering machine. Richard called the beeper number, and "Paula" returned the call. During the conversation, Richard said that he was unable to "talk like on the phone like I want to," but asked whether she had a trip planned his way. (Gov't App. at 2.) Orchowski responded negatively and Richard volunteered that a friend of his comes down her way quite often. Richard said he would have this friend get in touch with her and the friend would be able to "talk freely" with her. (Gov't App. at 3.) Later in the conversation, Richard said that his friend "gets down that way, uh, on the same thing that me and RUSTY was talking about," (id. at 4) and "as a matter of fact, uh, I'll probably give you a page when I can find out when he's comin' down and let you know, okay?" (Id. at 5.) Richard clearly stated that the friend's name was Fred Scott.

A few days later, Wilkey and Richard spoke over the phone, and again Wilkey asked if "Paula" had contacted Richard. Richard said that she had contacted him and that a "friend" would be in her area and his "uncle" would talk with her then. (Id. at 39, 42.) Wilkey testified that this reference to an uncle or friend was another reference to Richard's partner in drug trafficking.

At some point, Richard gave Fred Scott (a white male) the beeper number. On November 22, 1991, Scott paged "Paula" from the residential telephone of Jerome Lempe in Kansas City, Missouri. Scott said that he wanted to do business but had to get to a "cool" phone. (Trial Tr. at 85.) Scott called again later that day; telephone records indi-

cate that this call originated from a Ramada Inn hotel in Kansas City. In an unrecorded conversation, Scott informed "Paula" that he was in the business of buying cocaine, that he travelled to Houston for this business about once a month, and that he dealt with a man named Lee at the Hobby Airport in Houston. (Trial Tr. at 86.) Scott wanted to purchase two to three kilograms of cocaine, he was accustomed to paying $20,000 per kilo, and he wanted her to deliver it to him in Kansas City.

A few days later in a recorded conversation, "Paula" called Scott to tell him that she could not travel to Kansas City, and she invited him to come to Houston instead. He agreed to come the next morning. They further agreed that Scott would buy two kilos for $18,000 each. (Gov't App. at 9–10.) Scott arrived in Houston late the next night and made arrangements to meet her at a roadside park north of Houston the following morning to complete the deal. They met at the park as scheduled the next day. Law enforcement personnel videotaped and tape-recorded the meeting. Scott arrived with Jerome Lempe who waited at a picnic table while Scott completed the transaction. Scott paid "Paula" $36,000 and she provided Scott with two kilograms of cocaine as he had requested. Scott returned to his car where he and Lempe were promptly arrested.

A one-count indictment charged Scott and Richard with conspiracy to possess with intent to distribute cocaine in violation of 21 U.S.C. sections 841(a) and 846. At their joint trial, Richard did not testify or present witnesses on his behalf. Scott testified that he received the beeper number from Richard with the impression that "Paula" owned a warehouse that Scott might want to contact in connection with his tee shirt screen printing business and he called the number for that purpose, not for the purposes of purchasing cocaine. (Trial Tr. at 147.) Scott stated that in this first unrecorded conversation "Paula" brought up the idea of purchasing cocaine, and he went along with the idea on his own, not in concert with Richard. Scott admitted that he agreed to purchase cocaine and that he had been purchasing cocaine from an individual named Lee at the

Hobby Airport prior to calling "Paula's" beeper number. Scott also admitted that he intended to distribute the cocaine that he purchased from "Paula".

The jury convicted Scott and Richard on the conspiracy count. The court sentenced each defendant to a term of 137 months of imprisonment to be followed by 8 years of supervised release and a $2,000 fine. Scott and Richard now appeal their convictions, alleging various errors by the district court.

## II.

■ Both Scott and Richard challenge the sufficiency of the evidence to support their convictions. Our standards for evaluating the sufficiency of the evidence are well-known: we examine the evidence in the light most favorable to the government and the government receives the benefit of all inferences that may reasonably be drawn from the evidence. *United States v. Zerba*, 21 F.3d 250, 251–52 (8th Cir.1994) (citing *Hamling v. United States*, 418 U.S. 87, 124, 94 S.Ct. 2887, 2911, 41 L.Ed.2d 590 (1974)).

■ In this case, the government had the burden of presenting evidence sufficient to establish that Scott and Richard entered into a knowing agreement to possess with intent to distribute cocaine. *See United States v. Casas*, 999 F.2d 1225, 1229 (8th Cir.1993). " 'The government did not need to show a formal agreement; showing a tacit agreement by understanding proven wholly by circumstantial evidence or by inferences from the parties' actions is sufficient.' " *Id.* (quoting *United States v. Searing*, 984 F.2d 960, 964 (8th Cir.1993)). However, the government cannot rely on mere knowledge of the conspiracy but "must establish some degree of knowing involvement and cooperation." *Id.*

■ After carefully considering the proof offered by the government in this case, we are satisfied that the facts we outlined above constitute sufficient evidence to establish a knowing agreement between Scott and Richard to possess with intent to distribute cocaine. To briefly summarize, Richard obtained the beeper number with knowledge that it would be used to contact a source for

purchasing cocaine, Richard passed that number on to Scott as he had told both Wilkey and "Paula" he would do, and Scott arranged and completed the cocaine transaction. Further, the amount of cocaine involved in the transaction as well as Scott's admissions that he intended to distribute the cocaine demonstrate that the cocaine was headed for distribution. We are satisfied that the reasonable inferences emanating from this evidence combine to indicate that Richard and Scott had an agreement, either express or implied, to participate in a drug distribution conspiracy. The district court did not err in finding that the evidence was sufficient to support their convictions.

Scott argues that his testimony that Richard gave him the beeper number to help his tee shirt business and that he and Richard had no agreement to engage in a drug distribution conspiracy was uncontroverted. The jury, however, chose not to believe this testimony, as it was free to do. "[T]he jury, not the reviewing court, evaluates the credibility of witnesses and weighs their testimony." *Zerba,* 21 F.3d at 251–52 (citation omitted).

Scott and Richard rely on *United States v. Frol,* 518 F.2d 1134 (8th Cir.1975), to support their assertion that their mere acquaintance is insufficient to sustain their convictions. In *Frol,* we vacated a conviction of possession with intent to distribute for insufficiency of the evidence. 518 F.2d at 1138. We held that the statements of an alleged coconspirator were not properly admitted because the government had failed to establish proof of a conspiracy and that the remaining evidence was insufficient to convict the defendant. *Id.* at 1136–38. Evidence showed that the two alleged coconspirators were acquaintances, but there was no other evidence of a conspiracy in *Frol. Id.* at 1137. We have already determined that the convictions in the case at hand are supported by more than mere acquaintance and by more than the mere passing of a phone number from Richard to Scott, contrary to their assertions. We conclude that *Frol* is not controlling.

## III.

Scott raises two additional issues. First, he contends that the district court abused its discretion in refusing to allow him to discover or inspect his probation and parole file. Second, he contends that the district court erred in overruling his motion for mistrial based upon improper comments of the trial judge.

### A.

▆ Before trial, Scott requested permission to inspect his probation and parole file, or in the alternative, he requested that the district court inspect the file in camera. His alternative request was granted. Scott sought to obtain either the testimony of Investigator Orchowski (who had posed as "Paula") given during Scott's supervised release revocation hearing or a written statement from her. Both the magistrate judge and the district court inspected Scott's supervision file in camera and, upon finding that it contained no exculpatory material, denied Scott's request for discovery of the file. Scott contends that he was prejudiced by the district court's denial of his request for discovery, asserting that he was entitled to review any statements by Orchowski to determine if they are inconsistent with her trial testimony.

▆ The district court has "broad discretion with respect to discovery motions, and we will uphold the decision of the district court unless, considering all the circumstances, 'its rulings are seen to be a gross abuse of discretion resulting in fundamental unfairness' at trial." *United States v. Hintzman,* 806 F.2d 840, 846 (8th Cir.1986) (quoting *Voegeli v. Lewis,* 568 F.2d 89, 96 (8th Cir.1977)). "[A]ny error in administrating discovery rules is not reversible unless prejudicial to the substantial rights of the defendant." *United States v. Holland,* 884 F.2d 354, 357 (8th Cir.), *cert. denied,* 493 U.S. 997, 110 S.Ct. 552, 107 L.Ed.2d 549 (1989).

We have carefully inspected Scott's probation/supervised release file. The file contains neither a transcript of Orchowski's testimony at the revocation hearing (if she did in fact testify) nor any written statement from her. The only references to Orchowski are contained in the diary entries made in the file's "running record" of contacts. Two of these entries indicate that a copy of the Texas

Task Force's report was received from Orchowski, but no such copy is in the file. Also, Scott did not elicit any particular statement at trial that he believed was inconsistent with a statement made by or attributed to Orchowski at the revocation hearing or in the probation officer's file. Therefore, the district court's refusal to permit discovery of the file did not prejudice Scott's substantial rights. Even if statements by Orchowski had been present in the file, we note that Scott was personally present at the supervised release revocation hearing held before Judge Bartlett, and for this reason, the district court's refusal to permit discovery of the file did not prevent Scott from thoroughly cross-examining Orchowski at trial. Further, if Orchowski did testify at the revocation hearing, Scott could have ordered a transcript of the revocation hearing from the court reporter, but he did not. If instead a written statement from Orchowski was admitted at the revocation hearing, it would have been available at the Clerk's office as an exhibit for Scott's use at trial. Accordingly, we conclude that the district court did not abuse its discretion by refusing to permit Scott to inspect or discover the probation/supervised release file.

### · B.

▮ Scott's final contention is that the district court erred in overruling his motion for mistrial based on comments of the trial court. In a criminal trial, the trial judge is permitted to ask questions of witnesses in an attempt to clarify testimony and to elicit necessary facts. *See United States v. Gleason,* 766 F.2d 1239, 1243 (8th Cir.1985), *cert. denied,* 474 U.S. 1058, 106 S.Ct. 801, 88 L.Ed.2d 777 (1986). The role of a trial judge is more than a "mere moderator" of the trial, and it includes the prerogative, and sometimes the duty, to elicit facts deemed necessary to a clear presentation of the issues. *Id.* The court must take care, however, to preserve "an attitude of impartiality and [to guard] against giving the jury an impression that the court believes the defendant is guilty." *Id.* (quoting *Llach v. United States,* 739 F.2d 1322, 1329–30 (8th Cir.1985)) (other quotations omitted).

"We have always been reluctant to disturb a judgment of conviction by reason of a few isolated, allegedly prejudicial comments of a trial judge, particularly in a long trial." *United States v. Leuth,* 807 F.2d 719, 727 (8th Cir.1986) (citing *United States v. Bland,* 697 F.2d 262, 265 (8th Cir.1983)). When faced with a claim that a trial judge's prejudicial comments prevented a fair trial, this court will "balance and weigh the comments of the judge against the overall fairness of the trial ... [and conclude that] the balance is adversely tipped against the defendant in a criminal trial where the judge's role loses its color of neutrality and tends to accentuate and emphasize the prosecution's case." *Leuth* at 727.

*United States v. Van Dyke,* 14 F.3d 415, 417–18 (8th Cir.1994) (alteration in original).

▮ Scott's assertion of trial court misconduct stems from the combination of three incidents. In one instance, while cross-examining Wilkey, Scott's counsel incorrectly stated that he (counsel) was not getting paid. The trial court later told the jury that defense counsel's comment was "an inappropriate remark" because, in fact, defense counsel was being compensated under the Criminal Justice Act. (Trial Tr. at 179–80.) In the second instance, while the government was cross-examining Scott, the trial court asked Scott whether he was released from prison in 1990 or in 1991. Scott asserts that the trial court appeared agitated with him. The record shows that Scott had been making inconsistent statements on this point of fact and the district court attempted to clarify his testimony. In the third instance, the following exchange took place:

Q. Mr. Clark makes the insinuation if you get a not guilty verdict you can walk out of here, is that the truth, sir?

A. I don't know. If I get not guilty, I hope so but I am still facing charges. I have been prosecuted on the same charges twice all right. No, I don't get to walk free.

THE COURT: Just a minute. You aren't prosecuted on the same charges twice in this country.

(Trial Tr. at 177–78.) Immediately thereafter, counsel approached the bench and the remainder of the discussion took place off the record and out of the hearing of the jury. Scott contends that these instances combine to indicate that the judge lost his sense of neutrality toward Scott and his attorney and thereby prejudiced Scott's defense.

After reviewing the transcript of the trial, we find Scott's allegation of trial court misconduct to be without merit. The record does not reflect "excessive interplay" between the trial judge and witnesses, and the trial judge did not so impress "the jury with his partiality to the prosecution that this became a factor in determining defendant's guilt." *Van Dyke,* 14 F.3d at 423. In *Van Dyke,* we found that the trial court's conduct did reflect partiality to the prosecution and became an impermissible factor in determining guilt. Here, however, the district court's comments were attempts to clarify testimony or correct inaccuracies in the record. The comments did not prejudice Scott's right to a fair trial. Hence, we conclude that the district court did not err in overruling Scott's motion for mistrial.

### IV.

Richard makes two arguments in addition to his sufficiency of the evidence claim. First, Richard contends that the government made improper racially motivated use of its peremptory strikes in violation of *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). Second, Richard contends that he was denied the effective assistance of counsel in violation of the Sixth Amendment.

### A.

Richard is an African American. The venire panel included five African Americans at the outset. As a result of two challenges for cause, one by the government and one by both defendants, the list of African–American venirepersons dwindled to three. Those three were eliminated from the panel by peremptory strikes, two by the prosecutor and one by Scott. Consequently, Richard stood trial before an all-white jury. Richard now challenges the prosecution's use of its first two peremptory strikes to eliminate venirepersons Isaac Harris and David McKenzie, who are African Americans.

*Batson* dictates that, although a defendant has no right to " 'a jury composed in whole or in part of persons of his own race' ... the defendant does have the right to be tried by a jury whose members are selected pursuant to nondiscriminatory criteria." 476 U.S. at 85–86, 106 S.Ct. at 1717 (quoting *Strauder v. West Virginia,* 100 U.S. 303, 305, 25 L.Ed. 664 (1880)) (other citations omitted). *See also J.E.B. v. Alabama ex rel. T.B.,* — U.S. —, —, 114 S.Ct. 1419, 1421, 128 L.Ed.2d 89 (1994) ("we have reaffirmed repeatedly our commitment to jury selection procedures that are fair and nondiscriminatory"). We address the *Batson* issue with the following analysis in mind:

> A defendant who raises a *Batson* claim must make a prima facie showing that the prosecutor exercised peremptory challenges on the basis of race. If the defendant makes this showing, the burden shifts to the prosecutor to give a race-neutral explanation for striking the prospective jurors in question. A prosecutor's explanation for a strike is considered race neutral if the explanation is facially based on something other than the juror's race, i.e., if discriminatory intent is not inherent in the stated reason. After the defendant has a chance to develop a record showing the prosecutor's reason is pretextual, the district court must decide whether the defendant carried the burden of proving purposeful discrimination. We review a district court's rulings on *Batson* claims for clear error.

*United States v. Brooks,* 2 F.3d 838, 840 (8th Cir.1993) (internal citations omitted).

In this case, without expressly finding that Richard had made a prima facie showing that the government had exercised its peremptory strikes on the basis of race, the district court required the government to offer reasons for its use of two peremptory strikes against African Americans. To justify striking Isaac Harris, the prosecutor said that Mr. Harris was the only panel member to volunteer the outcome of the criminal jury

trial on which he served. In Mr. Harris's prior jury service, the panel had acquitted the defendant. The prosecutor also expressed concern about the possible impact of Mr. Harris's training in naval law upon his decisions as a juror. Richard challenges this strike as racially motivated because the government did not strike two similarly situated white male venirepersons who had also served on a criminal jury in the past.

■ We recognize that "[i]n this circuit, it is well established that the government may not justify peremptory challenges to venire members of one race unless venire members of another race with comparable or similar characteristics are also challenged." *Reynolds v. Benefield,* 931 F.2d 506, 512 (8th Cir.), *cert. denied,* 501 U.S. 1204, 111 S.Ct. 2795, 115 L.Ed.2d 969 (1991). Mr. Harris's characteristics, however, were not similar to those of the two white venirepersons who had served on a criminal jury in the past. In voir dire, the court did not question any jurors about the nature of the verdict in the criminal cases on which they had served as jurors, Mr. Harris merely volunteered the information. The distinguishing factor is not Mr. Harris's race but that he volunteered the fact that his jury had acquitted a defendant. Mr. Harris also indicated that he had had some training in naval law and that concerned the prosecutor. We conclude that the government articulated race-neutral explanations for its peremptory strike of Mr. Harris.

■ The prosecutor offered the following explanation for striking David McKenzie:

> As far as Mr. McKenzie, he's a pure peremptory. While he was sitting there I got the feeling from him, from the way he was looking and the way he was, he said he didn't want to be here, that he did not like the process.

(Tr. of *Batson* Proceedings at 4.) The district court agreed with this reason and found it to be race neutral stating, "I noted that myself." (*Id.*) Richard contends that this subjective justification for the strike is insufficient to survive a *Batson* challenge because the government did not fully develop the record.

■ We have noted concern in this circuit over the use of "subjective judgments" to explain the exercise of peremptory strikes because such judgments are "particularly susceptible to the kind of abuse prohibited by *Batson.*" *United States v. Sherrills,* 929 F.2d 393, 395 (8th Cir.1991), *quoted in Reynolds,* 931 F.2d at 513. To avoid this problem, counsel should "fully develop the record concerning the specific behavior by venire members" that motivated the prosecution to make a peremptory challenge. *Sherrills,* 929 F.2d at 395. *See also Reynolds,* 931 F.2d at 513.

In this case, the prosecutor specifically stated that Mr. McKenzie gave the impression that he did not want to be in court and that he did not like the process. This is a race-neutral explanation based upon a subjective judgment, but our review is complicated by the fact that the prosecutor did not more fully develop the record on the specific behavior that created this impression. *See Sherrills,* 929 F.2d at 395. However, it is significant in this case that the trial judge immediately stated that he had the same impression from the way Mr. McKenzie acted. The district court's observations are "particularly crucial" in determining the validity of a subjective judgment based on demeanor. *Id.* On this record we cannot say that the district court clearly erred in finding that the government stated a race-neutral explanation for striking Mr. McKenzie.

After the government offered its race-neutral explanations for striking Mr. Harris and Mr. McKenzie, Richard made no record demonstrating that the offered explanations were pretexts for discrimination. He also failed to object or to request an opportunity to develop the record when the district court ruled on the ultimate issue of purposeful discrimination before Richard had offered any evidence of pretext. Richard's "failure to follow up on his *Batson* objection could have been reasonably construed by the trial judge as an agreement that the expressed reasons were racially neutral." *Hopson v. Fredericksen,* 961 F.2d 1374, 1378 (8th Cir.1992). "Notwithstanding the failure of [Richard] to argue pretext, the district court did not have to believe the prosecutor's explanation." *United States v. Alvarado–Sandoval,* 997 F.2d

491, 493 (8th Cir.1993). The district court was free to find that the prosecutor's strikes were motivated by purposeful discrimination even absent evidence from Richard on pretext, but the court believed the prosecutor's explanations. "Since the trial judge's findings [of purposeful discrimination] largely will turn on evaluation of credibility, a reviewing court ordinarily should give those findings great deference." *Batson*, 476 U.S. at 98 n. 21, 106 S.Ct. at 1724 n. 21. The district court did not clearly err by overruling Richard's *Batson* objections.

Richard further argues that the district court misapplied *Batson*. After the government provided its race-neutral explanations, the government recalled for the judge how each of the five African–American venirepersons had been removed from the panel. Noting that the government was not responsible for the final strike, the district court overruled Richard's *Batson* objection. Richard contends that it was improper for the district court to rely on the fact that the government did not strike the final African–American venireperson in determining that the government's strikes did not violate *Batson*.

■■■■■ Richard correctly argues that a *Batson* violation arises whenever a prosecutor challenges a venireperson for discriminatory reasons without regard to how the government exercises subsequent strikes. *See United States v. Battle*, 836 F.2d 1084, 1086 (8th Cir.1987). Richard is incorrect, however, in stating that the district court relied solely on the fact that the government did not strike the final African–American venireperson in its decision to overrule his *Batson* objection. The district court first required the government to articulate racially neutral explanations for its strikes. In *Battle*, the analysis did not proceed this far because the district court failed to require the government to articulate race-neutral explanations for its use of strikes. *See id.* at 1086. In this case, the government articulated race-neutral explanations for its use of strikes. The burden then returned to Richard to demonstrate pretext. Richard failed to demonstrate pretext, and the district court believed the government's racially neutral ex-

planations. Because a factual record revealing nondiscriminatory reasons for the exercise of the strikes existed which convinced the judge of their proper exercise, we conclude that it was not reversible error for the district court to consider the fact that the government did not strike the final African–American venire member in reaching a finding that the government's explanations were not pretextual. *See United States v. Peete*, 919 F.2d 1168, 1180 (6th Cir.1990). The district court did not misapply *Batson*.

**B.**

■■■ Richard's final contention is that he was denied his Sixth Amendment right to the effective assistance of counsel because his trial attorney (1) failed to request a severance, and (2) failed to request an entrapment instruction or in the alternative that it was plain error for the district court to not offer such an instruction in this case. Richard raises these issues for the first time in this appeal. Claims of ineffective assistance of counsel are best raised in a motion for post-conviction relief pursuant to 28 U.S.C. § 2255, and we will not consider an ineffective assistance claim on direct appeal unless a proper factual record has been made before the district court. *United States v. Kenyon*, 7 F.3d 783, 785 (8th Cir.1993). For this reason, we decline to reach the merits of Richard's ineffective assistance of counsel claims.

■■■ We turn instead to Richard's alternative argument that the district court erred by failing to submit an entrapment instruction. Because Richard did not object at trial to the district court's failure to give an entrapment instruction, we review under a plain error standard. *See United States v. Loftus*, 992 F.2d 793, 797 (8th Cir.1993); *United States v. Felix*, 867 F.2d 1068, 1074 (8th Cir.1989). Plain error exists only when a miscarriage of justice would otherwise result. *Loftus*, 992 F.2d at 797.

■■■■ To prove entrapment as a matter of law, the evidence must establish that "the 'government agent originated the criminal design; that the agent implanted in the mind of an innocent person the disposition to com-

mit the offense; and that the defendant then committed the criminal act at the urging of the government agent.'" *United States v. Ford,* 918 F.2d 1343, 1347 (8th Cir.1990) (quoting *United States v. Shaw,* 570 F.2d 770, 772 (8th Cir.1978)). *See also Jacobson v. United States,* —— U.S. ——, ——, 112 S.Ct. 1535, 1540, 118 L.Ed.2d 174 (1992). In *Jacobson,* the Supreme Court overturned a conviction because of entrapment where the evidence showed that the defendant was only ready and willing to commit the crime after the government had spent 2½ years convincing him that he had or should have had a right to engage in the criminal behavior. —— U.S. at ——, 112 S.Ct. at 1543. The Court noted, however, that where the government simply offers an individual an opportunity to commit a crime, and the individual "promptly avails himself of this criminal opportunity, it is unlikely that his entrapment defense would [warrant] a jury instruction." *Id.* —— U.S. at ——, 112 S.Ct. at 1541.

Richard argues that he gave Scott the beeper number only after repeated inducements over a period of five months. We are unable to find evidence of repeated inducements in this record. To the contrary, the record demonstrates that Wilkey did no more than provide the beeper number and on occasion remind Richard of the opportunity by asking whether he had contacted "Paula". "Paula" spoke to Richard on the phone once, when she returned his page on her beeper. It is clear from the transcript of that conversation that Richard did most of the talking and already had devised a plan with Scott to complete a drug transaction with her. We see no evidence to suggest that the government engaged in improper inducement.

Moreover, we conclude that Richard was predisposed to commit this crime before any government conduct entered into the scene. Richard's interest in cocaine trafficking had developed before he met Wilkey. Richard joined a conversation between Wilkey and another inmate in the prison infirmary, the topic of which was the price of cocaine in Florida and Texas. (Trial Tr. at 4.) Richard told Wilkey that he and his partner had been purchasing cocaine from a source in Houston, and Richard wanted to know Wilkey's co-caine source. (*Id.* at 4–5, 17.) The government did not implant criminal disposition into the mind of an innocent person in this case. The government merely provided Richard with an opportunity to commit the crime, reminded him of that opportunity, and Richard availed himself of that opportunity of his own accord.

We are troubled by the Texas Task Force's fee arrangement with Wilkey, the inmate informant. The Texas Task Force had an agreement with Wilkey whereby they would pay him a 10% commission on the proceeds of every transaction he arranged. We are concerned with the propriety of such an arrangement and the incentives it creates. This arrangement standing alone, however, does not establish entrapment, and no evidence exists in this case to indicate that the fee arrangement caused improper inducements by the informant in order to make money. Richard disclosed Wilkey's fee arrangement at trial and argued its effect to the jury.

Given this record, we cannot say that a miscarriage of justice resulted from the district court's failure to submit an instruction on entrapment. Hence, we find no plain error.

## V.

In conclusion, for the reasons stated above, we affirm Scott's and Richard's convictions for conspiracy to possess with intent to deliver cocaine.